IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MITCHELL GARCIA,

      Plaintiff,

vs.                                                              No. CIV 11-0011 JB/RHS

MONICA CASUAS, and the
CITY OF RIO RANCHO,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Monica Casuas and the City of Rio

Rancho's Motion for Summary Judgment and Memorandum in Support thereof, filed October 7,

2011 (Doc. 41)("MSJ"). The Court held a hearing on November 21, 2011. The primary issues are:

(i) whether Defendant Monica Casaus had probable cause to arrest Plaintiff Mitchell Garcia;

(ii) whether Casaus is entitled to qualified immunity on Garcia's 42 U.S.C. § 1983 arrest-without-

probable-cause claim; (iii) whether Casaus initiated or continued the criminal proceedings against

Garcia without probable cause; and (iv) whether Defendant City of Rio Rancho is liable for any

constitutional violation that Casaus may have committed. The Court will grant in part and deny in

part the Motion for Summary Judgment. The Court will grant the Motion for Summary Judgment

with respect to Counts I and II. The Court concludes that, based on the undisputed facts, Casaus had

probable cause to arrest Garcia, and that she is entitled to summary judgment in her favor on

Garcia's 42 U.S.C. § 1983 false-arrest and malicious-prosecution claims. Because there is no

underlying constitutional violation, the Court will also grant summary judgment in favor the City

of Rio Rancho on Garcia's § 1983 municipal liability claims. The Court will not decide the Motion

for Summary Judgment with respect to Counts IV and V, because the Court's rulings on Counts I and II dispose of all the remaining federal claims in the case and because the Court will decline to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, the Court will remand the remaining state law claims and the case to the Thirteenth Judicial District, Sandoval County, State of New Mexico.

## FACTUAL BACKGROUND

Garcia attempts to dispute many of the Defendants' undisputed facts. Garcia has also included additional facts in his Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment, filed October 21, 2011 (Doc. 46)("Response"). In contravention of D.N.M.LR-Civ. 56.1(b), Garcia did not number the facts in dispute or refer with particularity to the portions of the record upon which he relied to dispute them. Garcia included a factual background, which does not number or distinguish additional facts. See Response at 2-9. Furthermore, Garcia did not separate his disputes of fact from arguments regarding those facts. See Response at 10-35. The Defendants dispute what they consider Garcia's additional facts. See Defendants Reply Memorandum of Law in Support of Motion For Summary Judgment [Doc. 41], filed November 3, 2011 (Doc. 50)("Reply"). The Defendants also object to the manner in which Garcia has organized his facts in violation of the local rules, stating that Garcia "appears to expect Defendants and the Court to sift through the Response searching for what he believes constitute controverted facts." Reply at 2. The Court notes that Garcia has structured his facts and disputes of facts in a way that makes them difficult to navigate, and that it has expended a great deal of effort to organize and present these facts.

On January 26, 2010, Jennifer Katz invited two friends and their children to gather at her

apartment at 4501 Sprint Boulevard, Northeast in Rio Rancho, New Mexico.  See Declaration of

Jennifer Katz ¶ 1, at 1, filed October 7, 2011 (Doc. 41-27)("Katz Decl."); Police Report of Officer

Matt Phelps at 1 (dated January 29, 2010), filed October 7, 2011 (Doc. 41-5)("Phelps Report"); MSJ

¶ 1, at 3 (setting forth this fact); Response at 35 (not disputing this fact).  One of these friends was

Mitchell Garcia, who brought with him his son, age five, and daughter, age seven.  See Katz Decl.

¶ 2, at 1; Declaration of Audrey Odom ¶¶ 2, 4, at 1, filed October 7, 2011 (Doc. 41-28)("Odom

Decl."); MSJ ¶ 2, at 3-4 (setting forth this fact); Response at 35 (not disputing this fact).  Garcia

arrived sometime after 9:00 p.m.  See Katz Decl. ¶ 2, at 1; Odom Decl. ¶ 4; MSJ ¶ 2, at 3-4 (setting

forth this fact); Response at 35 (not disputing this fact).  The other friend was Audrey Odom, who

brought her son, K.J., age five, and her daughter, Kyler, age one and a half.  See Katz Decl. ¶ 3, at

1; Odom Decl. ¶¶ 1, 3 at 1; MSJ ¶ 3, at 4 (setting forth this fact); Response at 35 (not disputing this

fact).  Katz' son, Christian, age four, was also at the apartment.  See Katz Decl. ¶ 4, at 1; Odom

Decl. ¶ 5, at 1; MSJ ¶ 4, at 4 (setting forth this fact); Response at 35 (not disputing this fact).  Garcia

met Odom for the first time on the evening of January 26, 2010, but knew Katz from working

together at Express Scripts.[1]  See  Deposition of Mitchell Garcia at 5:20-21, 8:16-17(dated August

31, 2011), filed October 21, 2011 (Doc. 46-2)("Garcia Depo."); Response at 3 (setting forth this

fact).[2]  Katz and Odom had known each other since June 2009.  See Transcript of Grand Jury

_____

[1]Express Scripts is a pharmacy benefit manager that processes prescriptions through a network of retail pharmacies and a home delivery program.  See About Us, Express-Scripts.com, available at http://www.express-scripts.com/aboutus/ (last visited December 2, 2011).

[2]The Defendants do not appear to dispute the fact that Garcia met Odom on January 26, 2010, but knew Katz from working at Express Scripts.  Local rule D.N.M.LR-Civ. 56.1 provides that:

The Reply must contain a concise statement of those facts set forth in the Response

Proceedings at 26:1-2 (March 4, 2010)(Johnston, Katz), filed October 21, 2011 (Doc. 46-4)("GJ

Tr."); Response at 3 (setting forth this fact).[3]

At around 10:00 p.m. the three adults began consuming alcoholic beverages.  <u>See</u> Katz Decl.

¶ 5, at 1; Odom Decl. ¶ 6, at 1; MSJ ¶ 5, at 4 (setting forth this fact); Response at 35 (not disputing

this fact).  At some point later that evening, Katz and Odom left to go to Odom's nearby residence

to retrieve some beer.  <u>See</u>  Katz Decl. ¶ 5, at 1; Odom Decl. ¶ 6, at 1; MSJ ¶ 5, at 4 (setting forth

this fact); Response at 35 (not disputing this fact).  This trip took ten to fifteen minutes.  <u>See</u> Katz

Decl. ¶ 5, at 1; Odom Decl. ¶ 6, at 1; MSJ ¶ 5, at 4 (setting forth this fact); Response at 35 (not

disputing this fact).  After returning to the apartment, Katz, Odom, and Garcia continued to drink

and converse.  <u>See</u> Katz Decl. ¶ 6, at 1-2; Odom Decl. ¶ 7, at 2; MSJ ¶ 6, at 4 (setting forth this fact);

Response at 35 (not disputing this fact).  At this point, four of the children were placed in Christian's

room to sleep, while the youngest child, Kyler, was placed in a playpen in Katz' bedroom.  <u>See</u> Katz

Decl. ¶ 6, at 1-2; Odom Decl. ¶ 7, at 2; MSJ ¶ 6, at 4 (setting forth this fact); Response at 35 (not

disputing this fact).  Later on, Katz moved Christian to Katz' bedroom and placed K.J. on the bed

in Christian's bedroom.  <u>See</u> Katz Decl. ¶ 6, at 1-2; Odom Decl. ¶ 7, at 2; MSJ ¶ 6, at 4 (setting forth

---

which the movant disputes or to which the movant asserts an objection. Each fact
must be lettered, must refer with particularity to those portions of the record upon
which the movant relies, and must state the letter of the non-movant's fact. All
material facts set forth in the Response will be deemed undisputed unless specifically
controverted.

D.N.M.LR-Civ. 56.1(b).  Because the Defendants do not specifically controvert the asserted fact that
Garcia met Odom on January 26, 2010, but knew Katz from Express Scripts, the Court will deem
this fact admitted.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[3]The Defendants do not appear to dispute the fact that Katz and Odom had known each other
for a year.  Because the Defendants have not specifically controverted Garcia's asserted fact, the
Court will deem this fact admitted.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

this fact); Response at 35 (not disputing this fact).  Garcia asserts that Odom attempted to pull down his pants, insisted on touching him, and continually asked him if he was interested in either Katz or Odom.  See Garcia Depo. at 6:18-23; Response at 3 (setting forth this fact).[4]  Before January 26, 2010, Garcia and Katz had engaged in sexual relations on at least two other occasions.[5]

Sometime thereafter, Katz and Odom stepped about fifteen feet outside of Katz' apartment to speak to Katz' neighbors.  See Katz Decl. ¶ 7, at 2; Odom Decl. ¶ 8, at 2; MSJ ¶ 7, at 4 (setting forth this fact); Response at 35 (not disputing this fact).  Garcia stated that he would watch the children.  See Katz Decl. ¶ 7, at 2; Odom Decl. ¶ 8, at 2; MSJ ¶ 7, at 4 (setting forth this fact); Response at 35 (not disputing this fact).  Garcia spilled beer on his pants and shirt in the kitchen. See Garcia Depo. at 87:17-25; Response at 4 (setting forth this fact).[6]  At some point, Garcia passed out next to his daughter on the floor of Christian's bedroom.  See Katz Decl. ¶ 7, at 2; Odom Decl.

---

[4]The Defendants dispute that Katz or Odom were romantically interested in or made sexual advances towards Garcia and assert that this statement is "not a fact at all but merely a theory or recent fabrication of Plaintiff."  Reply at 3.  The Defendants do not present any affidavit or deposition testimony from Katz or Odom denying that these acts occurred.  The Defendants assert that Garcia did not raise this theory when the police interviewed him.  The Court views Odom's advances as an additional fact and will treat it as an undisputed factual assertion.  Whether Garcia recently fabricated this fact is a credibility determination that the Court is not entitled to address in a motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Faragalla v. Douglas Cnty. Sch. Dist. RE 1, 411 F.App'x 140, 147 (10th Cir. 2011)(unpublished)("And her attacks on the credibility of defendants' evidence is misplaced because 'it is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.'").  Because the Defendants did not specifically controvert the asserted fact that Katz or Odom were romantically interested in or made sexual advances towards Garcia, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1.

[5]The Defendants do not appear to dispute the fact that, before January 26, 2010, Garcia and Katz had been involved with each other.  Because the Defendants did not specifically controvert Garcia's asserted fact, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[6]The Defendants do not appear to dispute that, at some point, Garcia spilled beer on himself.  Because the Defendants have not specifically controverted the asserted fact, that Garcia spilled beer on his shirt and pants, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

¶ 8, at 2; MSJ ¶ 7, at 4 (setting forth this fact); Response at 35 (not disputing this fact).  From time

to time, Katz or Odom would return to the apartment to check on the children.  See Katz Decl. ¶ 8,

at 2; Odom Decl. ¶ 9, at 2; MSJ ¶ 8, at 4-5 (setting forth this fact); Response at 35 (not disputing this

fact).  At about 4:00 a.m. on the morning of January 27, 2010, Katz returned to her apartment and

discovered K.J. sitting on her living room couch and crying.  See Katz Decl. ¶ 9, at 2; Odom Decl.

¶ 10, at 2; MSJ ¶ 9, at 5 (setting forth this fact).[7]  Katz also noticed Garcia standing in the hallway,

---

[7]Garcia disputes that Katz discovered K.J. sitting in the living room and crying at 4:00 a.m.
on the morning of January 27, 2010.  See Response at 35.  Garcia makes a sweeping statement that
there are "genuine disputes of material fact as to Defendants' contention of undisputed fact #9-15,
17, 18, 25, 26, 29, 30, 31, 38, 47 as specifically detailed supra, § I-II."  Response at 35.
D.N.M.LR-Civ. 56.1 requires that:

> The Response must contain a concise statement of the material facts cited by the
> movant as to which the non-movant contends a genuine issue does exist.  Each fact
> in dispute must be numbered, must refer with particularity to those portions of the
> record upon which the non-movant relies, and must state the number of the movant's
> fact that is disputed.  All material facts set forth in the Memorandum will be deemed
> undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Garcia has not referred with particularity to those portions of the record
upon which he relies to dispute the Defendants' asserted facts and does not attempt to specifically
controvert the Defendants' asserted facts.  In sections I and II of the Response, Garcia: (i) challenges
the credibility of the Katz, Odom, and K.J.; (ii) notes his disagreement with the Defendants'
statement that probable cause existed; (iii) notes his disagreement with the Defendants as to whether
reasonable standards, policies, and procedures were satisfied; and (iv) asserts that a reasonable fact-
finder could find that Casaus' investigation was inadequate, because it was not based on independent
evidence.  The Court cannot properly evaluate the credibility of witnesses in deciding a motion for
summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; Faragalla v. Douglas
Cnty. Sch. Dist. RE 1, 411 F.App'x at 147 ("And her attacks on the credibility of defendants'
evidence is misplaced because 'it is axiomatic that a judge may not evaluate the credibility of
witnesses in deciding a motion for summary judgment.'").  In any event, Garcia does not appear to
dispute what Katz reported she saw; rather, Garcia disputes whether Casaus and other police officers
should have believed this statement.  The Court read both Garcia's Factual Background and section
I and II, but could not locate any comment on this asserted fact other than the general statement on
page 35, which the Court noted above.  Because Garcia did not specifically controvert the asserted
fact, that Katz returned at 4:00 am and found K.J. crying, the Court will deem this fact admitted.
See D.N.M.LR-Civ. 56.1(b).

about ten feet away from K.J.  See Katz Decl. ¶ 9, at 2; Police Report of Corporal Jeff Lepori at 7

(dated January 27, 2010), filed October 7, 2011 (Doc. 41-2)("Lepori Report"); MSJ ¶ 9, at 5 (setting

forth this fact).[8]  Katz asked Garcia what was wrong, and Garcia replied that he did not know.

See Katz Decl. ¶ 10, at 2; Lepori Report at 7; Statement of Jennifer Katz at 1, filed October 7, 2011

(Doc. 41-4)("Katz Statement"); MSJ ¶ 10, at 5 (setting forth this fact).[9]  Katz noticed that Garcia's

pants were wet, and when she asked Garcia why his pants were wet, he replied "kids," before going

to the bathroom.  Katz Decl. ¶ 11, at 2; Katz Statement at 1; Lepori Report at 7; MSJ ¶ 11, at 5

(setting forth this fact).[10]

---

[8]Garcia disputes that Katz noticed him in the hallway while K.J. was crying.  See Response at 35.  Garcia does not, however, do more than generally state that he disputes this fact.  Again, the Court may not evaluate the credibility of witnesses, and Garcia does not appear to dispute that Katz reported that she saw Garcia, but whether she in fact saw Garcia.  Garcia did not, however, provide a citation to evidence in the record that would dispute this fact or make any arguments other than attacking Katz' credibility.  Local rule D.N.M.LR-Civ. 56.1(b) requires that a Response "refer with particularity to the portions of the record upon which the non-movant relies" to specifically controvert an asserted fact.  D.N.M.LR-Civ. 56.1(b).  Because Garcia did not specifically controvert the asserted fact, that Katz saw Garcia in the hallway, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[9]Garcia disputes that he told Katz that he did not know why K.J. was upset.  See Response at 35.  Garcia does not, however, do more than generally state that he disputes this fact.  Again, the Court may not evaluate the credibility of witnesses, and Garcia does not appear to dispute that Katz reported that she asked him this question, but rather he disputes whether the interaction occurred.  Because Garcia did not specifically controvert the asserted fact, that Katz asked him what was wrong and he replied he did not know, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[10]Garcia disputes that Katz asked him why his pants and denies responding "kids."  Response at 4, 35.  Garcia states, "Plaintiff has no personal recollection of that statement and denies having made it . . . . In reality, Plaintiff was still intoxicated and later was unsure of how his pants became wet, whether from spilled beer or otherwise." Response at 4.  Garcia does not cite to the record to support his dispute of this fact.  It is not the Court's responsibility to scour the record for evidence to defeat a motion for summary judgment. See Gonzales v. City of Albuquerque, No. 09-0520, 2011 WL 1114830, at *24 (D.N.M. Mar. 23, 2011)(Browning, J.)("[I]t is not the Court's responsibility to scour the record for evidence to defeat [a] Motion for Summary Judgment . . . ."); Hauff v. Petterson, 755 F.Supp.2d 1138, 1150 (D.N.M. 2010)(Kelly, J.)("Nor is it the court's function to

Katz took K.J. into Christian's room and noticed that the bed was wet, but that K.J. was not. See Katz Decl. ¶ 12, at 2; Katz Statement at 1; Lepori Report at 7; MSJ ¶ 12, at 5 (setting forth this fact).  Katz asked K.J. why the bed was wet, K.J. replied that the "guy had done it" and that the guy had been laying next to him in the bed.  Katz Decl. ¶ 12, at 2; Katz Statement at 1; Lepori Report at 7; Phelps Report at 1; MSJ ¶ 12, at 5 (setting forth this fact).[11]  Katz asked K.J. if the guy had done anything else, and K.J. replied that the guy had pulled his pants down and hit him.  See Katz Decl. ¶ 13, at 2; Katz Statement at 1; Lepori Report at 7; Phelps Report at 1; MSJ ¶ 13, at 5 (setting forth this fact).[12]  Katz locked K.J. in Katz' bedroom and retrieved Odom, K.J.'s mother, and two neighbors, Andrew Szczepanski and David Dominguez, to escort Garcia and his children from her apartment.  See Katz Decl. ¶ 14, at 3; Katz Statement at 1; Phelps Report at 1; MSJ ¶ 14, at 5 (setting forth this fact).[13]  When Odom arrived, K.J. told her that Garcia had chocked him and wanted to

---

'scour the record in search of evidence to defeat a motion for summary judgment.' " (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996))).  Because Garcia did not "refer with particularity to those portions of the record upon which" he relies, the Court will deem this fact admitted.  D.N.M.LR-Civ. 56.1(b).

[11]Garcia disputes what K.J. told Katz, apparently because there were no independent witnesses to the statement.  See Response at 5, 35 ("There are no independent witnesses to K.J. allegedly making these statements to Katz, and both sides acknowledge that K.J.'s clothing was completely dry, and that K.J. exhibited no physical signs of abuse.").  Again, the Court may not evaluate the credibility of witnesses.  Because Garcia did not specifically controvert the asserted fact, that K.J. said the guy was the reason the bed was wet or that the guy laid down next to him, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[12]Garcia disputes this fact, that K.J. said the guy had pulled his pants down and hit him, apparently because there were no independent witnesses.  See Response at 5, 35.  Because Garcia did not, however, specifically controvert the asserted fact, that K.J. said the guy had pulled his pants down and hit him, with citations to the record, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[13]Garcia disputes that Katz locked K.J. in her bedroom and went to get Katz.  See Response at 35.  Other than his general objection to the Defendants' facts set forth in paragraphs 9 through 15, Garcia does not explain why he objects to this fact.  See Response at 35.  Because Garcia did not

fight.  See Katz Decl. ¶ 15, at 3; Katz Statement at 1; Odom Decl. ¶ 11, at 2; Statement of Audrey

Odom at 1, filed October 7, 2011 (Doc. 41-3)("Odom Statement"); Phelps Report at 1; MSJ ¶ 15,

at 5 (setting forth this fact).[14]

Katz and Odom began to hit Garcia as he left the apartment and went to his vehicle.  See

Katz Decl. ¶ 16, at 3; Odom Decl. ¶ 12, at 2; Odom Statement at 1; Lepori Report at 7; Phelps

Report at 1; MSJ ¶ 16, at 6 (setting forth this fact); Response at 35 (not disputing this fact).  Two

men witnessed this fight, but did not hit Garcia.  See Katz Decl. at 1; Response at 5 (setting forth

this fact).[15]  Odom then called the police stating that Garcia choked her son.  See Phelps Report at

1; Police Report of Officer B. Thacker at 1 (January 27, 2010), filed October 7, 2011 (Doc. 41-

6)("Thacker Report"); MSJ ¶ 17, at 6 (setting forth this fact).[16]  Officer Matt Phelps, Corporal Jeff

_____

specifically controvert the asserted fact, that Katz locked K.J. in her room and went to get Odom,
the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[14]Garcia disputes that K.J. told Odom that he choked K.J. and wanted to fight, and states that
"[m]onths later, Katz claims she overheard K.J. tell Odom that the same guy had struck him and
'wanted to fight,' although she makes no reference to this language in her original, contemporaneous
statement to police."  Response at 5.  Garcia appears to allege that Katz' statement, that she
overheard K.J. tell Odom that Garcia choked K.J. and wanted to fight, is a recently fabricated
statement.  To address this issue would require the Court to examine credibility issues, which it is
not permitted to do at summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.
Even if the Court were permitted to weigh credibility, Odom also reports that K.J. told her that
Garcia choked him and wanted to fight.  See Odom Decl. ¶ 11, at 2.  Because Garcia did not
specifically controvert the asserted fact, that K.J. told Odom that the guy choked him and wanted
to fight, or provide a citation to the record, the Court will deem this fact admitted.  See D.N.M.LR-
Civ. 56.1(b).

[15]The Defendants do not appear to dispute that the two men saw the fight.  See Reply at 3-4.
Because the Defendants did not specifically controvert the asserted fact, the Court will deem this
fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[16]Garcia disputes that Odom called the police.  See Response at 5, 35.  Garcia states that he
left the scene with his children and called the police from a gas station.  See Response at 5 (citing
Garcia Depo. at 88:13-23).  That Garcia called the police does not mean that Odom did not also call
the police.  The Court views Garcia's assertion that he called the police as an additional fact and will

Lepori and Sergeant M. Naus from the Rio Rancho Police Department ("RRPD") responded to the call.  See Phelps Report at 1; Lepori Report at 7; MSJ ¶ 18, at 6 (setting forth this fact).  When the police arrived at Katz' apartment, Phelps asked K.J. what had happened, and K.J. began by saying that "Mr. Mitchell" hit him in the head and elbowed him.  Phelps Report at 1.  See also MSJ ¶ 18, at 6 (setting forth this fact).[17]  Lepori also heard K.J. say that the man had his hands down K.J.'s pants.  See Lepori Report at 7; MSJ ¶ 18, at 6 (setting forth this fact).  Lepori then advised Phelps not to question K.J. further, because investigators needed to be involved and a safe-house interview should be conducted.  See Lepori Report at 7; Phelps Report at 1; MSJ ¶ 18, at 6 (setting forth this fact).  Phelps took into custody and placed in evidence the sheets and bedding that he noticed were still damp.  See Phelps Report at 1; MSJ ¶ 18, at 6 (setting forth this fact); Response at 6 (setting forth this fact).  Phelps did not take photographs of K.J., but photographed the scene, the bedroom, and Odom's injuries.  See Phelps Report at 1; Response at 6 (setting forth this fact).[18]

　　　After leaving Katz' apartment, Garcia when to a nearby gas station in Bernalillo and called the police.  See Thacker Report at 1; MSJ ¶ 19, at 6 (setting forth this fact); Response at 5 (setting

---

treat it as an additional fact.  Because Garcia did not specifically controvert the asserted fact, that Odom called the police and told them Garcia choked K.J., the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

　　　[17]Garcia disputes that K.J. told Phelps about "Mr. Mitchell," because, at other times, K.J. could not identify Garcia by name and referred to the perpetrator as "that guy."  Response at 5.  That K.J. was later unable to name Garcia does not mean that, on the night of the incident, he was unable to do so.  Garcia's argument goes more to K.J. and Phelps' credibility than to disputing the statement, and the Court cannot consider credibility in ruling on this motion.  Because Garcia did not specifically controvert the asserted fact, that K.J. told Phelps that Garcia hit and elbowed him, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

　　　[18]The Defendants do not appear to dispute that Phelps did not photograph K.J.  See Reply.  Because the Defendants did not specifically controvert the asserted fact, the Court will deem the fact admitted.  See D.N.M.LR-Civ. 56.1(b).

forth this fact); Response at 35 (not disputing this fact).  Officer B. Thacker[19] of the RRPD contacted

Garcia at the gas station that night.  <u>See</u> Thacker Report at 1; MSJ ¶ 19, at 6 (setting forth this fact);

Response at 35 (not disputing this fact).  Garcia told Thacker that he was asleep with his two

children at Katz' apartment when Katz came into the room and started to beat him up.  <u>See</u> Thacker

Report at 1; MSJ ¶ 20, at 6-7 (setting forth this fact); Response at 35 (not disputing this fact).  Garcia

denied the existence of any reason for this beating to have occurred.  <u>See</u> Thacker Report at 1; MSJ

¶ 20, at 6-7 (setting forth this fact); Response at 35 (not disputing this fact).  Thacker told Garcia that

there was an allegation that he had choked a five-year old, and Garcia responded that he never

choked the boy and had no idea about what Thacker was talking.  <u>See</u> Thacker Report at 1; MSJ ¶

21, at 7 (setting forth this fact); Response at 35 (not disputing this fact).  Thacker smelled alcohol

on Garcia's breath, and Garcia admitted that he had consumed a large amount of alcohol.  <u>See</u>

Thacker Report at 1; MSJ ¶ 22 (setting forth this fact); Response at 35 (not disputing this fact).

Thacker observed a wet spot on Garcia's left pant leg and took photographs of the spot.  <u>See</u> Thacker

Report at 1; Supplemental Police Report of Officer B. Thacker at 1-2, filed October 7, 2011 (Doc.

41-7)("Thacker Supplemental Report"); Photograph of Mitchell Garcia 1 (taken January 27, 2010),

filed October 7, 2011 (Doc. 41-8)("Photo. 1"); Photograph of Mitchell Garcia 2 (taken January 27,

2010), filed October 7, 2011 (Doc. 41-9)("Photo. 2"); Photograph of Mitchell Garcia 3 (taken

January 27, 2010), filed October 7, 2011 (Doc. 41-9)("Photo. 3"); Photograph of Mitchell Garcia

4 (taken January 27, 2010), filed October 7, 2011 (Doc. 41-10)("Photo. 4"); Photograph of Mitchell

Garcia 5 (taken January 27, 2010), filed October 7, 2011 (Doc. 41-11)("Photo. 5"); MSJ ¶ 23, at 7

---

[19]None of the briefs or documents submitted to the Court included Officer Thacker's full
name.

(setting forth this fact); Response at 35 (not disputing this fact).

Later in the day on January 27, 2010, Detective Monica Casaus was assigned to the case.
See Declaration of Monica Casaus ¶ 4, at 1 (dated October 5, 2011), filed October 7, 2011 (Doc. 41-1)("Casaus Decl."); MSJ ¶ 24, at 7 (setting forth this fact); Response at 35 (not disputing this fact).
Casaus graduated from the New Mexico Law Enforcement Academy in December 2002 and had
been with the RRPD since 2003.  See Casaus Decl. ¶ 3, at 1; MSJ ¶ 24, at 7 (setting forth this fact);
Response at 35 (not disputing this fact).  Casaus obtained the entire file to date within a day or two
of taking over the case, including: (i) the Lepori Report; (ii) the Odom Statement; (iii) the Katz
Statement; (iv) the Phelps Report; (v) the Thacker Report; and (v) the Supplemental Thacker Report
and Photo.'s 1, 2, 3, 4, and 5.  See Casaus Decl. ¶ 6, at 2; MSJ ¶ 25, at 7 (setting forth this fact).[20]

---

[20]Garcia generally disputes that the facts asserted in paragraph 25 of the Motion for Summary
Judgment, that Casaus had the file to date within a day or two of taking over the case, with the
statement "Plaintiff contends that there are genuine disputes of material facts as to Defendants'
contentions of undisputed facts # . . . 25 . . . ." Response at 35.  Nowhere in his arguments attacking
Casaus' investigation or in his factual statement does Garcia explain why he disputes that Casaus
possessed the file.  Instead, Garcia states that the Court should not "consider the statements made
by other officers in their police reports, or witness statements (unless exculpatory in nature), since
Defendant Casaus states she did not rely on these in making her probable cause determination."
Response at 17.  Garcia points to Casaus' deposition testimony to support this assertion:

> Q:    All Right.  I'm going to boil down the types of evidence that you had at your
>       disposal when you sought the arrest warrant, if you could just answer the
>       questions.  Isn't it true that the only evidence that you had against Plaintiff
>       when you sought that arrest warrant was the testimony, the safe house
>       interview of K.J.?
>
> A.    Yes.

Deposition of Monica Casaus at 36:5-11 (taken August 31, 2011), filed October 21, 2011 (Doc. 46-1)("Casaus Depo.").  The Defendants cite another portion of Casaus' deposition which went as
follows:

> Q:    Do you remember relying on other statements prior to seeking an arrest

-12-

warrant?

A:      I rely on information and evidence collected from the whole case, from the beginning til I become involved.

Q:      Okay. And I believe it was your testimony earlier that you relied on statements, police reports, made by Officer Lepori; is that correct?

A:      Yes.

Q:      And Officer Thacker; is that correct?

A:      Yes.

Deposition of Monica Casaus at 48:13-22 (taken August 31, 2011), filed November 3, 2011 (Doc. 50-2)("Casaus Depo."). Another portion of Casaus' deposition testimony also involved questions from Garcia's attorney about upon what evidence Casaus relied:

Q: You knew that the only evidence you had against him was one forensic interview of a five-year-old child; isn't that correct?

A: That's not correct.

. . .

Q: What else was your investigation based off of?

A: The totality of evidence collected.

Q: What other evidence that I may have failed to ask you about was at your disposal prior to seeking an arrest warrant?

A: Statements, police reports, forensic interview

. . .

Q: And all this, the totality of the circumstances led you to believe that you had probable cause to cause an arrest of a citizen fo the United States?

A: Yes

Casaus Depo. at 62:19-63:17. Earlier in the deposition, Garcia's attorney also asked whether Casaus

Casaus contacted All Faiths Receiving Home, advised it of the situation, and scheduled a safe-house

interview of K.J. for February 12, 2010, the earliest possible date.  See Casaus Decl. ¶ 12, at 3; MSJ

¶ 26, at 8 (setting forth this fact).  Casaus advised Odom not to speak to K.J. about the incident, and

Odom complied with that advice.  See Casaus Decl. ¶ 12, at 3; Odom Decl. ¶ 14, at 3; MSJ ¶ 26, at

8 (setting forth this fact).[21]  Casaus did not conduct an on-scene investigation of the allegations.

---

reviewed any witness statements from Katz or Odom before Garcia's arrest, and Casaus replied that
she had.  See Casaus Depo. at 19:11-13.  The deposition testimony Garcia cites, on its own, appears
to controvert the asserted fact that Casaus had the file to date on the investigation and establish that
Casaus relied only on K.J.'s safe-house interview.  When examined in context, however, it appears
that Casaus' answer to that question was an aberration or mistake, or was incomplete, or was a very
technical answer to the word "evidence," because throughout the deposition, Casaus maintains that
she relied on the police reports and witness statements.  Casaus' agreement that the only evidence
she had was K.J.'s safe-house interview presents no more than a scintilla of evidence, and does not
create a genuine issue of material fact whether Casaus had in her possession or relied on the police
reports or witness statements in this case.  See Applied Capital, Inc. v. Gibson, 558 F.Supp.2d
1189,1206 ("The Court is not obligated to rely on what is no more than a scintilla of evidence --
evidence that Grizzly Drilling is not even using or emphasizing -- to block summary judgment.");
Serrano v. Venemen, 410 F.Supp.2d 1049, 1070(D.N.M. 2005)(Browning, J.)("This statement,
standing alone, does not present more than a scintilla of evidence . . . .").  Additionally, at other
points in his Response, Garcia complains that not only did Casaus rely on Katz' and Odom's
statements, but that "Defendant Casaus took a proactive role in weighing the credibility of the
statements in favor of Odom and Katz," and "credited the stories of Odom, Katz and statements
allegedly made by K.J. with one hundred percent accuracy."  Response at 11-13.  In his Factual
Background, Garcia concedes that "Casaus confined the remainder of her investigation to reviewing
police reports and other secondary, non-eyewitness sources, which primarily relayed information
provided by Katz and Odom."  Response at 7.  Garcia thus appears to concede both that Casaus
possessed the police reports and witness statements, and that she relied on them in his own statement
of the undisputed facts.  Because both the Defendants and Garcia set forth the asserted fact, that
Casaus had the file to date and relied on it, the Court finds that Garcia has not specifically
controverted those facts and will deem them admitted.  See D.N.M.LR-Civ. 56.1(b).

[21]Garcia appears to dispute that Odom complied with Casaus' advice not to speak to K.J.
about the incident.  See Response at 35, 38.  Garcia asserts that K.J. uses the words "safe-house"
without prompting, despite "Defendant Casaus having allegedly instructed Odom not to talk with
K.J. about the interview in the two weeks prior to February 12, 2010."  Response at 30.  Garcia
argues that K.J.'s use of the word "safe-house" suggests a tainted interview.  See Response at 31.
Garcia states that, during the safe-house interview, K.J. says "'you can call him the kids' dad,'
repeating what he has been possibly been told to say prior to the interview, despite the alleged

See Casaus Depo. at 17:9-17; Response at 2 (setting forth this fact).[22]

On February 12, 2010, Casaus met with All Faith Receiving Home's Director of Forensic Services Michelle Aldana and Forensic Interviewer Marissa Nochumson who was scheduled to handle the interview.  See Casaus Decl. ¶ 13, at 3; MSJ ¶ 27, at 8 (setting forth this fact); Response at 35 (not disputing this fact).  After meeting with Odom and K.J. for the purposes of introducing herself, and becoming familiar with K.J. and his mother, Nochumson began the interview.  See Casaus Decl. ¶ 13, at 3; MSJ ¶ 28, at 8 (setting forth this fact); Response at 35 (not disputing this fact).  The interview was recorded.  See DVD K.J. Safe House Interview (dated February 12, 2010), filed October 7, 2011 (Doc. 41-13)("Safe-House DVD"); Safe House Tr.; MSJ ¶ 28, at 8 (setting forth this fact); Response at 35 (not disputing this fact).  K.J. made the following statements during the safe-house interview:

> A:      The guy took me and punched me in the face.
>
> . . .
>
> A:       The kid's dad want to punch me and choke me, and my mom -- my mom
>           called the police.
>
> . . .

---

instruction from Defendant Casaus against coaching."  Response at 38 (citing Safe-House Interview of K.J. Transcript at 30:13 (dated February 12, 2010), filed October 7, 2011 (Doc. 41-14)("Safe-House Tr.")).  Garcia's citations to the safe-house interview do not, however, specifically controvert the Defendants' asserted fact, that Odom obeyed Casaus' instruction.  All Garcia offers are some statements that do not clearly support his proposition.  Because Garcia did not specifically controvert the Defendants' fact, the Court will deem the fact, that Odom did not talk to K.J. about the interview, admitted.  See D.N.M.LR-Civ. 56.1(b).

[22]The Defendants do not indicate whether this fact is disputed.  Because the Defendants did not specifically controvert the asserted fact, that Casaus did not conduct an on-scene investigation, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

A:      And he took his pants off.

Q:      Then he took his pants off?

A:      Yeah.

Q:      Oh -- Tell me about that.

A:      Because he wants me to show it.  He wants -- he wants to show me.

Q:      He wants to show you?

A:      Yeah.

Q:      Tell me what he wants to show you.

A:      His butt and his pee pee.

Q:      His butt and his pee pee?

A:      Yeah.  That's disgusting.

Q:      Did he show you his butt and his pee pee?

A:      Yeah.

Q:      Yeah?  What does his pee pee look like?

A:      Big.

. . .

Q:      Did he do something with his pee pee?

A:      Yeah.  He peed on me.

Q:      He peed on you?

A:      Yeah.

Q:      Did I get that right?

A:      Yeah.  I need to tell my mom.  We need to tell my mom quick.

. . .

Q:      What part of your body did he pee on?

A:      (Points to mouth).

Q:      Your mouth?

A:      Uh-huh.

Q:      Okay.

A:      That was the worst.

Q:      That was the worst?

A:      Yeah.

. . .

Q:      Where were his hands when he peed on your mouth?

A:      On my shoulder.

Q:      On your shoulder?

A:      Yeah, because he wanted me to hold still.

Q:      Because he wants you to hold still?

A:      He don't want me running away from him, too.

Q:      Oh.  Could you run away?

A:      No, I can't breathe.

Q:      You can't breathe? How come?

A:      I don't know.

Q:      You don't know?

A:      He was almost done with the pee.

Q:      Oh.

A:      And he was done, and I drank some water.

Q:      And you drank some water.

A:      Yeah, I drank some water -- me -- I did.

Q:      You did. Okay.  Where was his pee pee when he peed on you.

A:      I was drinking water, and he peed on me again.

Q:      You were drinking water and he peed on you again? Did I get that right?

A:      Yeah.

Q:      Ahh -- where was his pee pee when he peed on your mouth?

A:      Ahh -- on my shoulder right here with his both hands.

Q:      On your shoulder --

A:      Wait.  He just got his hands off his pee pee, and he did it, and I drinked a lot of water and he peed me again.

Q:      Okay.  So, he had his hands on his pee pee, you said?

A:      Yeah.

Q:      Yeah?  And, [K.J.], where was his pee pee when he peed on your mouth?

A:      I was drinking water, and he peed on my butt.  He pulled -- that guy pulled off my pants.

Q:      He pulled off your pants?  Oh.  And then what did he do?

A:      Jennifer comes out, and "Ahhh."

Q:      Oh, Jennifer comes out?

A:      Yeah.

Q:      Oh.  Okay.  What made the pee come out of his pee pee?

-18-

A:      He -- I was drinking water, and he peed on Jennifer and my mom.

Q:      He peed on Jennifer and your mom.

A:      Yeah.

Q:      Oh.

A:      And I said, "What the -- " and then -- I said, "Excuuuse me."

Q:      Oh.

A:      And he say, "Oh, that's a tough kid."

Q:      [K.J.], I want to understand what happened to you, okay?

A:      I was beating him up.  My mom hit beating him up, and I was beating him up, and the police were shooting the guy -- oh, no -- they put him in jail.

. . .

Q:      . . . Did he say something when the pee cam out of his pee pee?

A:      (Shakes head "yes")

Q:      Yeah.  Tell me about that.

A:      He just (inaudible) to -- he likes, and he say, "[K.J.], hold still."

. . .

Q:      What -- what part of your body does he put his pee pee on when he pees on your mouth?  Show me where the pee goes on your mouth?

A:      (Points to mouth)

Q:      Oh, okay.

A:      And my tongue.

. . .

A:      He started to pee, and he peed on me again, again, again, again.

-19-

. . .

Q:     Yeah.  How were his pants?

A:     He pulled my pants down and he pulled his pants down.

Q:     He pulled your pants down and his pants down?

A:     (Shakes head "yes.")

. . .

A:     He just pulled my pants down because he wants to.

Q:     Okay.  'Cause he wants to do what?

A:     Pull my pants down.

Q:     Pull your pants down?

A:     Yeah.

Q:     Okay.  Were you sitting down or laying down or laying down when he pulled your pants down?

A:     I was sitting down -- I was sitting down.

. . .

Q:     Oh, okay.  How is his body when he pulled your pants down?

A:     Big.

Q:     Big?

A:     Yeah, his shoulder and big.

Q:     Okay.  Was he sitting down or laying down or how was his body?

A:     Laying down.

. . .

Q:     Oh.  I'm gonna get some dolls, [K.J.], to help me understand.

. . .

Q:     And this one's going to be that guy, okay?  Show me how he pulled your
       pants down.  Can you show me on the doll?  Now, these are like real people
       dolls, so they have real body parts, okay?  Show how his pants were?

. . .

Q:     Well, these dolls help me understand what happens.  Can you help me
       understand?

A:     Yeah. They can help you understand.

Q:     Okay.  Show me again when he peed on your [tummy].  Oh, okay.  So -- so,
       where was your mouth?

A:     Right here there.  And he got glasses.

Q:     So, it looks like you -- when you were showing me, you put the pee pee on
       your mouth?

A:     Yes.

. . .

Q:     And, [K.J.], you were telling me that you drank water after he peed in your
       mouth?

A:     Yeah.

Q:     Yeah? Whose idea was that?

A:     He's like too -- he wants to.

Q:     He said he wants to? Who wants to?

A:     The kids' dad.

Q:     The kids' dad?

A:     Yeah.

Q:     What does he want to do?

-21-

A:      He wants to pee on my -- on my tongue and back.

Q:      He wants to pee on your tongue and back?

A:      Yeah.

. . .

Q:      Oh.  Where was his pee pee when he choked you?

A:      Right over here.

Q:      Over here.  What part is that?

A:      That's my neck.

Q:      Your neck.  So, his pee pee was right here on your neck? Did I get that right?

A:      Yeah.

Q:      Yeah.  Was it on the inside or the outside.

A:      Inside and outside.

Safe-House Tr. at 2:10, 3:20-21, 11:14-12:4, 12:13-19, 13:3-15:14, 15:24-16:4, 16:18-23, 18:16-17, 21:13-22:4, 22:13-20, 23:7-7-21, 24:25-25:9, 26:13-25, 29:25-30:8 (alterations original); MSJ ¶ 29, at 8-12 (setting forth this fact).[23]   When K.J. was asked to demonstrate with the two male

---

[23]Although Garcia states that "there are genuine disputes of material fact as to Defendants' contentions of undisputed fact . . . 29," Response at 35, it is not clear what his basis for disputing this fact is.  Garcia may again be contesting K.J.'s credibility, which the Court cannot consider, or the methods used during the interview, which would be more appropriate for the analysis section, see Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;] [l]egal argument should be reserved for separate portions of the brief.'"(citation omitted)).   In any event, it is not the Court's responsibility to scour the record for evidence to defeat a motion for summary judgment. See Gonzales v. City of Albuquerque, 2011 WL 1114830, at *24; Hauff v. Petterson, 755 F.Supp.2d at 1150 ("Nor is it the court's function to 'scour the record in search of evidence to defeat a motion for summary judgment.'" (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d at 562)). Because Garcia did not "refer with particularity to those portions of the record upon which" he relies

anatomically correct dolls what occurred when "that guy" peed on his mouth, K.J. placed the penis

of the larger doll, which was identified as "that guy," into the mouth of the smaller doll, which was

identified as himself.  See Casaus Decl. ¶ 19, at 5; Safe-House DVD at 42:00 - 46:26; MSJ ¶ 30, at

12 (setting forth this fact).[24]  During the interview, K.J. also stated that Garcia peed on Katz and

_____

or specifically controvert the cited sections of the transcript, the Court will deem this fact admitted.
See  D.N.M.LR-Civ. 56.1(b).
        In his Response, Garcia also asserts an additional fact in relation to the safe-house interview,
that "K.J. stated that he and his mother watched movie, of unknown subject matter, concerning his
still unidentified (perhaps imaginary) friend Andy being a girl, presumably before the interview."
Response at 7.  A dispute about the origin of the name "Andy" arose at the November 21, 2011
hearing.  Garcia asserted that he does not know who Andy is, that the reference is problematic, and
that it suggests that the interview might be tainted.  Transcript of Hearing at 24:16-25:3 (November
21, 2011)(Garcia)("Tr.").  The Defendants suggested that K.J. actually said "and he." Tr. at 37:2-8.
The Court, having reviewed the Safe-House DVD, determined that K.J., when asked who was there,
responds: "Christian was fooling around and he went in Jennifer's room." Safe-House DVD at 8:26-
8:33. The interviewer misunderstood K.J. and when she asks "Who's Andy," K.J. first says "I don't
know who's Andy." Safe-House DVD at 8:55-9:00.  Then, K.J.  apparently remembers the name
Andy from a movie and refers to Andy being a girl.  See Safe-House DVD at 9:00-9:08. Because
the Safe-House DVD does not support the asserted fact that K.J. said Andy was at Katz' apartment,
the Court finds that it has been specifically controverted, and will not admit Garcia's fact that K.J.
has a friend, real or imaginary, named Andy.  See D.N.M.LR-Civ. 56.1(b).

        [24]Garcia disputes the fact that,

    [w]hen K.J. was asked to demonstrate with the two anatomically correct dolls what
    occurred when Plaintiff Garcia 'peed' on his mouth and it got on his tongue, K.J.
    placed the penis of the larger doll, which he identified as Plaintiff, into the mouth of
    the smaller doll, which he identified as himself.

Response at 35 (citing MSJ ¶ 30, at 12).  In his Factual Background section, Garcia notes that,
throughout the safe-house interview, K.J. did not identify Garcia by name and referred to him as "the
kids' dad" or "that guy."  Response at 5.  Garcia also challenges the use of anatomically correct
dolls.  See Response at 22.  To the extent that Garcia challenges the Defendants' statements about
K.J. being asked to demonstrate when "Plaintiff Garcia" peed on his mouth or that K.J. identified
the larger doll as "Plaintiff," the Court agrees that those statements are not used in the safe-house
interview.  After watching the DVD, the Court determines that it was the interviewer, Nochumson,
who identified the dolls and called the larger doll "that guy," consistent with K.J.'s earlier
statements.  See Safe-House DVD at 42:10-13.  To the extent that Garcia challenges the technique
of anatomically correct dolls, the Court will not consider that argument at this time, but will address

Odom, and that the police threatened to shoot Garcia on the night of the incident.  See Safe-House

Tr. at 15:24-16:4, 23:5-6; Response at 7 (setting forth this fact).[25]

Following the safe-house interview of K.J., Casaus consulted with Deputy District Attorney

Cheryl Hein Johnston of the Thirteenth Judicial District Attorney's Office and briefed her on the

situation.  See Casaus Decl. ¶ 20, at 5; MSJ ¶ 31, at 12 (setting forth this fact).  Casaus had learned

from Odom that Garcia had been divorced and had obtained sole custody of his two children.  See

Casaus Decl. ¶ 20, at 5; MSJ ¶ 31, at 12 (setting forth this fact).  Given the information that had been

obtained from K.J. about choking, hitting, and punching, as well as the allegations of other

inappropriate criminal behavior, there was concern about the safety of Garcia's two children

remaining in his custody.[26]  Based on these concerns and Casaus' belief that probable cause existed

to arrest Garcia, Casaus, with the concurrence of Johnston, decided to seek a warrant for Garcia's

---

it in its analysis.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4.  Because Garcia has partially
disputed this fact, the Court will modify the fact to reflect that K.J. did not identify either of the dolls
and that the larger doll was referred to only as "that guy."  D.N.M.LR-Civ. 56.1(b).

[25]The Defendants do not appear to dispute that K.J. stated that Garcia peed on Katz and
Odom or that the police threatened to shoot Garcia.  See Reply at 3-4.  Because the Defendants did
not specifically controvert the asserted fact, the Court will deem the fact admitted.  See D.N.M.LR-
Civ. 56.1(b).

[26]Garcia states that he disputes paragraph 31 of the Motion for Summary Judgment, but it
is not clear whether Garcia objects to this portion of the paragraph, stating that Casaus was
concerned about his children remaining in his custody, or the next portion of the paragraph, stating
that Casaus believed that she had probable cause.  See Response at 35.  If Garcia objects to the
portion of the paragraph stating that Casaus was concerned about his children, Garcia has presented
no evidence to specifically controvert the Defendants' asserted fact.  If Garcia objects to the portion
of the paragraph stating that Casaus believed she had probable cause, Garcia has presented no
evidence that Casaus did not believe that she had probable cause.  The Court will consider whether
Casaus in fact had probable cause under the applicable law in its analysis section.  See Ruiz v. City
of Brush, 2006 WL 1816454, at *4.  Because Garcia has not specifically controverted either portion
of paragraph 31, that Casaus was concerned about his children or that Casaus believed she had
probable cause, the Court will deem the facts asserted therein admitted.  See D.N.M.LR-Civ.
56.1(b).

arrest without delay.  See Casaus Decl. ¶ 20, at 5; MSJ ¶ 31, at 12 (setting forth this fact).  Casaus

prepared an Arrest Warrant Affidavit, Arrest Warrant, and Criminal Complaint for Criminal Sexual

Penetration of a Minor contrary to N.M.S.A. 1978, § 30-9-11, and presented the documents to the

Honorable Louis P. McDonald, Chief Judge of the Thirteenth Judicial District Court, County of

Sandoval, State of New Mexico.  See Casaus Decl. ¶ 21, at 5-6; Affidavit for Arrest Warrant at 1

(dated February 12, 2010), filed October 7, 2011 (Doc. 41-15)("Casaus Warrant Aff."); Arrest

Warrant at 1, filed October 7, 2011 (Doc. 41-16); Criminal Complaint at 1, filed October 7, 2011

(Doc. 41-17); MSJ ¶ 32, at 13 (setting forth this fact); Response at 35 (not disputing this fact).  Chief

Judge McDonald found that there was probable cause and issued the Arrest Warrant.  See Arrest

Warrant at 1; MSJ ¶ 33, at 13 (setting forth this fact); Response at 35 (not disputing this fact).

On February 12, 2010, sometime after 5:00 p.m., State Police Agent Nathan Lucero arrested

Garcia when he arrived at his residence in Los Lunas, New Mexico.  See Police Report of Agent

Nathan Lucero at 1-2 (dated February 16, 2010), filed October 7, 2011 (Doc. 41-24)("Lucero

Report"); MSJ ¶ 34, at 13 (setting forth this fact); Response at 35 (not disputing this fact).  Lucero

transported Garcia to the RRPD.  See Lucero Report at 2; MSJ ¶ 34, at 13 (setting forth this fact);

Response at 35 (not disputing this fact).  At the RRPD, Casaus interviewed Garcia at about 7:00 p.m.

See Casaus Decl. ¶ 23, at 6; MSJ ¶ 35, at 13 (setting forth this fact); Response at 35 (not disputing

this fact).  Garcia was first advised of his rights and completed an Advice of Rights form.

See Casaus Decl. ¶ 23, at 6; Advice of Rights Form at 1 (dated February 12, 2010), filed October

7, 2011 (Doc. 41-18); MSJ ¶ 35, at 13 (setting forth this fact); Response at 35 (not disputing this

fact).  The interview was videotaped and transcribed.  See Casaus Decl. ¶ 24, at 6;  DVD Interview

of Mitchell Garcia by RRDPS Officer Monica Casaus (dated February 12, 2010), filed October 7,

2011 (Doc. 41-19)("Garcia Interrogation DVD"); Interview of Mitchell Garcia Transcript (dated February 12, 2010), filed October 7, 2011 (Doc. 41-20)("Garcia Interrogation Tr."); MSJ ¶ 36, at 13 (setting forth this fact); Response at 35 (not disputing this fact).  Garcia initially confirmed that: (i) he was invited to Katz' home with his children and met Odom there; (ii) he agreed to watch the children for a few minutes while the women went to get beer; and (iii) when the women got back to the apartment, they put the children to sleep, and they all started drinking.  See Garcia Interrogation Tr. at 5:7-6:16; MSJ ¶ 37, at 14 (setting forth this fact); Response at 35 (not disputing this fact).  During the interview, Garcia made the following statements:

> A:     And after that, I started getting really drunk, and I laid next to my daughter. And after that, my daughter's screaming at me at the top of her lungs because Jennifer's yelling at me saying, "To get up and you need to get out of the house."  I didn't know what was going on.
>
> . . .
>
> A:     Finally, I asked Jennifer, "What the hell's going on," and that girl goes, "You touched my son."  I said, "I didn't hit your son.  I never -- I'm not like that. I didn't do that."  And I got in the truck, and I went to the gas station and called the police.  That's when I found out that the girl was saying that I actually sexually touched him, you know.
>
> . . .
>
> Q:     And what time do you think you passed out?
>
> A:     I don't -- I wouldn't know.
>
> Q:     Estimate.
>
> A:     I can't estimate.  I can't give you an estimate because I don't know.  We were drinking and -- I wasn't keeping track of time.  I know that I was getting way too drunk, and I just went and laid right next to my daughter and my son, and I was woken up.
>
> . . .

Q:     So, you're saying that you went to sleep, and never got up again until you were awoke --

A:     Yes --

Q:     -- they woke you up when they were telling you, "Get out"?

A:     Yes, yeah, and, actually, I can't even tell you if it was like five, ten minutes. I know I laid down, and next thing, boom, they were beating me up.  I don't know if Jennifer was, because I don't remember.  I just remember the girl was just throwing swings at me.

. . .

Q:     I talked to Jennifer, and she -- she -- they left the apartment, and she came back in and talked to you.  She told me everything.

A:     I don't know ever talking to her. [sic]  The only time I remember talking to her after I fell asleep is when she woke me up, yelling at me to get out of the house.

Q:     So, let's go to the incident of -- of -- what I'm talking about.  She states she walks in and the little boy is crying on the sofa, and you're standing there, and your pants are wet.  Explain that to me.

A:     My pants are wet?  No.  My pants were never -- I was not standing there.  I was asleep next to my daughter.  I even woke my daughter up and asked her if she was okay.  Like, because she was freezing, and there was no -- they had no blankets, and I asked her, "Are you okay?"  She said, "Fine," so I was like, I laid next to her and went to sleep because I was too drunk.

Q:     So explain your pants being wet.

A:     I don't know.  I can't explain my pants being wet.  I don't remember my pants being wet at all.

. . .

Q:     Well, you're a grown man.  I think that you would remember if you peed on yourself.

A:     Ma'am, I was really drunk, and I didn't even want to be driving my kids in the vehicle.  And if she was beating me up, whatever, and I can't do anything.  I'm trying to protect my kids, probably I pissed my pants.  Excuse

-27-

the language.  But, to be honest with you, I don't remember ever waking up to my pants being wet.

. . .

Q:      You're stating that you may have urinated on yourself or anything.  Do you think you could have, at any time, urinated anywhere else?

A:      I don't think so, I can tell you several times I've ever gotten really, really drunk, I've actually never made it to the bathroom and peed on the wall or something.

. . .

Q:      Okay.  Well, we did collect all the bedding from that room, okay?

A:      Okay.

Q:      And it was wet, okay?  And it's being sent to the lab.  So you need to be aware of that.

A:      So, you're saying I got up and peed on the bed?

Q:      I don't know. I'm asking you.

A:      I can't say.  I mean, I was drunk.

. . .

Q:      Well -- okay.

A:      My son's five years old.  Am I --

Q:      So, if your son's as close to you --

A:      And my son has seen me, which I've never wanted him to, but he's seen me so drunk where I walk into a bedroom -- just to be like, "Hey --" you know, "I love you.  I love you."  My son's like, "What are you doing? (Inaudible)," you know.  My daughter, she's even told me, "Dad, get your butt to bed.  You're drunk."  It's not the point?  My point is, is that, you know, when I -- when I got drunk, if I got up and I didn't make it to the bathroom, or -- because I don't even know where -- I've never been to the house ever -- never been to the bathroom before except for once.  I'm getting drunk.  If I get up and I peed on the bed -- that's still disgusting, but damn, I mean.

-28-

. . .

Q:      . . . So, explain to me how your urine got on this bed.

A:      Drunk.  Got up and peed on it, I guess.  I don't know.  I don't know.  I, I
        can't tell you right now there's two people that will tell you that I've gotten
        so drunk, I didn't make it to the bathroom.  I peed on the floor.  I peed in the
        corner.  I peed in the hallway.  My girlfriend will even tell you that I've
        gotten so drunk, I didn't make it and I peed in the bedroom.

. . .

Q:      Do you want me to get into it with you?  Do you want me to tell you exactly
        what he told me?

A:      No, because it's disgusting and I don't want to know.  I did not do anything
        to this kid.  If I got up and peed on him, damn.  Sorry.  Really.  I need to stop
        drinking.

Garcia Interrogation Tr. at 6:17-22, 7:7-13, 9:22-10:4, 11:19-12:3, 12:4-23, 14:1-8,14:19-24, 15:8-

15, 17:24-18:13, 19:20-20:2, 20:20-24; MSJ ¶ 38 (setting forth this fact).[27]  Garcia did not mention

that Katz and Odom were biased during his interrogation or in any previous statements to police.

See Thacker Report at 1; Garcia Interrogation Tr. at 1:1-28:10.  Toward the end of the interview,

Garcia was asked if he would consent to a search to obtain a swab of the inside of his mouth for the

purpose of getting a DNA sample.  See Garcia Interrogation Tr. at 20:25-21:2; MSJ ¶ 39, at 16

(setting forth this fact); Response at 35 (not disputing this fact).  Garcia replied: "I don't know.  I

want to do this because I know I didn't do anything.  I want to.  But I'm afraid if I do that, and I did

_____

[27]Garcia disputes paragraph 38 of the Motion for Summary Judgment, which contains
citations to the Garcia Interrogation Transcript.  See Response at 35.  Garcia argues that the Court
should "not be distracted by other sources of information, including Plaintiff's post-arrest, custodial
statements."  Response at 17.  The relevance of these statements, however, is legal argument that
the Court will address in its analysis section.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4.
Because Garcia has not specifically controverted any of the custodial statements in paragraph 38 of
the Motion for Summary Judgment, the Court will deem the facts asserted therein admitted.  See
D.N.M.LR-Civ. 56.1(b).

pee on him, then I still get in trouble." Garcia Interrogation Tr. at 21:24-22:1; MSJ ¶ 39, at 16 (setting forth this fact); Response at 35 (not disputing this fact). Because Garcia asserted his right to consult with an attorney, the interview terminated without acquisition of a DNA sample. See Garcia Interrogation Tr. at 25:4-6; MSJ ¶ 39, at 16 (setting forth this fact); Response at 35 (not disputing this fact).

On March 3, 2010, a nolle prosequi[28] was filed in the case against Garcia that was then pending in the state magistrate court. See Casaus Decl. ¶ 28, at 7; MSJ ¶ 40, at 16 (setting forth this fact); Response at 35 (not disputing this fact). The nolle prosequi stated that the Office of the District Attorney of the Thirteenth Judicial District entered it in the interest of justice and that the case would be sent to the grand jury. See Casaus Decl. ¶ 28, at 7; MSJ ¶ 40, at 16 (setting forth this fact); Response at 35 (not disputing this fact). On March 4, 2010, the case against Garcia was presented to a grand jury, which returned an indictment charging Garcia with: (i) two counts of Criminal Sexual Penetration in the First Degree, contrary to N.M.S.A. 1978, § 30-9-11(D)(1); (ii) one count of Child Abuse -- Intentional (No Death or Great Bodily Harm), contrary to N.M.S.A. 1978, § 30-6-1(D); and (iii) one count of Contributing to the Delinquency of a Minor, contrary to N.M.S.A. 1978, § 30-6-13. See Casaus Decl. ¶ 29, at 7-8; MSJ ¶ 41, at 16-17 (setting forth this fact); Response at 35 (not disputing this fact). Casaus, Odom, and Katz appeared as witnesses before the grand jury. See Casaus Decl. ¶ 29, at 7-8; MSJ ¶ 41, at 16-17 (setting forth this fact); Response at 35 (not disputing this fact). Before giving her testimony, Casaus turned over all the information she had related to the case to Johnston, including: (i) the police reports; (ii) Katz' and

---

[28]"A nolle prosequi represents a 'legal notice that a . . . prosecution has been abandoned.'" Miller v. Spiers, 339 F.App'x 862, 866 n.1 (10th Cir. 2009)(unpublished)(citing Black's Law Dictionary 1074 (8th ed. 2004)).

Odom's statements; (iii) the video of K.J.'s safe-house interview; and (iv) the video of Casaus'

interview of Garcia.  See Casaus Decl. ¶ 29, at 7-8; MSJ ¶ 41, at 16-17 (setting forth this fact);

Response at 35 (not disputing this fact).

On March 22, 2010, Casaus signed an Affidavit for Search Warrant of Garcia to obtain the

DNA for comparison with the bed sheets, which were taken into evidence on January 27, 2010.

See Casaus Decl. ¶ 30, at 8; Affidavit for Search Warrant at 1 (dated March 22, 2010), filed October

7, 2011 (Doc. 41-22); MSJ ¶ 42, at 17 (setting forth this fact); Response at 35 (not disputing this

fact).  Casaus presented the Affidavit for Search Warrant to Chief Judge McDonald the same day,

at which time Chief Judge McDonald issued a search warrant.  See Affidavit for Search Warrant at

5; Casaus Decl. ¶ 30, at 8; MSJ ¶ 43, at 17 (setting forth this fact); Response at 35 (not disputing this

fact).  On March 23, 2010, two Q-tip swab DNA samples were obtained from Garcia at the Sandoval

County Detention Center.  See Casaus Decl. ¶ 30, at 8; New Mexico Department of Public Safety

Forensic Laboratories Laboratory Report at 1 (dated July 27, 2010), filed October 7, 2011 (Doc. 41-

23)("DNA Lab Report"); MSJ ¶ 44, at 17 (setting forth this fact); Response at 35 (not disputing this

fact).  There was no search of his home or other parts of his body when the search warrant was

executed.  See Casaus Decl. ¶ 30, at 8; MSJ ¶ 44, at 17 (setting forth this fact); Response at 35 (not

disputing this fact).  The soiled sheets and blanket and buccal swabs from both K.J. and Garcia were

then submitted to the New Mexico Department of Public Safety Forensic Laboratory with a request

for DNA examination.  See Casaus Decl. ¶ 32, at 8; DNA Lab Report at 1; MSJ ¶ 45, at 17 (setting

forth this fact); Response at 35 (not disputing this fact).

Shortly after Garcia's arrest, bond was set at $150,000.00 cash only, which Garcia did not

post.  See Complaint ¶ 30, at 4; MSJ ¶ 46, at 17-18 (setting forth this fact); Response at 35 (not

disputing this fact).  Following the grand-jury indictment, bond was reduced to $100,000.00, which Garcia did not post.  See Complaint ¶ 34, at 5; MSJ ¶ 44, at 17-18 (setting forth this fact); Response at 35 (not disputing this fact).  On June 4, 2010, however, a stipulated order was entered to reduce Garcia's bond to $10,000.00 cash or surety.  See Complaint ¶ 35, at 5; MSJ ¶ 44, at 17-18 (setting forth this fact); Response at 35 (not disputing this fact).  After posting this bond, Garcia was released from custody.  See Complaint ¶¶ 36-37, at 5; MSJ ¶ 44, at 18 (setting forth this fact); Response at 35 (not disputing this fact).

On June 27, 2010, the New Mexico Department of Public Safety Forensic Laboratory issued its report finding that no semen was detected on the bed sheets or blanket.  See Casaus Decl. ¶ 33, at 8; Declaration of Carrie Zais ¶¶ 4-5, at 2 (dated September 23, 2011), filed October 7, 2011 (Doc. 41-29)("Zais Decl."); MSJ ¶ 47, at 18 (setting forth this fact).[29]  While it may be possible to extract DNA from semen, the New Mexico Department of Public Safety Forensic Laboratory did not have the ability to extract DNA from urine, or from sheets or bedding upon which someone may have urinated.  See Zais Decl. ¶¶ 4, 5, at 2; MSJ ¶ 48, at 18 (setting forth this fact).[30]  On October 7, 2010,

_____

[29]Garcia purports to dispute the fact that the New Mexico Department of Public Safety Forensic Laboratory issued a report finding no semen on the bedding.  See Response at 35 ("Plaintiff contends there are genuine issues of material fact as to Defendants' contentions of undisputed fact # . . . 47 . . . .").  Garcia does not explain on what basis he disputes this fact and provides no evidence to controvert the fact.  See Gonzales v. City of Albuquerque, 2011 WL 1114830, at *24 ; Hauff v. Petterson, 755 F.Supp.2d at 1150.  Because Garcia did not specifically controvert the fact that the New Mexico Department of Public Safety Forensic Laboratory issued a report finding no semen on the bedding, the Court will deem the fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[30]Garcia disputes that the New Mexico Department of Public Safety Forensic Laboratory did not have the ability to extract DNA from urine, because he is "without sufficient information to admit or deny the factual basis of #48."  Response at 35.  Garcia states that "widely available, published articles demonstrate the feasibility of extracting DNA from urine, although Plaintiff cannot afford, and therefore has not retained, an expert witness in this regard."  Response at 35 n.4 (citing Deelman, et al, "A Method for the Ultra Rapid Isolation of PCR-Ready DNA from Urine and

the District Attorney for the Thirteenth Judicial District entered a nolle prosequi, stating that there

was insufficient evidence to continue with the prosecution and also that the charges against Garcia

were being dismissed under the principles of State v. Kilpatrick, 104 N.M. 441, 722 P.2d 692 (Ct.

App. 1986).[31]  See Casaus Decl. ¶ 34, at 8; Nolle Prosequi at 1 (dated October 7, 2010), filed

October 7, 2011 (Doc. 41-26); MSJ ¶ 49, at 18 (setting forth this fact); Response at 35 (not disputing

this fact).

## PROCEDURAL BACKGROUND

On December 1, 2010, Garcia filed his Complaint to Recover Damages for Deprivation of

Civil Rights in the Thirteenth Judicial District, Sandoval County, State of New Mexico.  See Doc.

1-1 ("Complaint").  Garcia filed his suit under 42 U.S.C. § 1983 and the New Mexico Tort Claims

Act, N.M.S.A. 1978, §§ 41-4-1 through 41-4-30 ("NMTCA").  See Complaint at 1.  Garcia alleges

three federal constitutional violations: (i) Unreasonable Seizure (Arrest) - Count I; (ii) Prosecution

Without Probable Cause and Selective Prosecution - Count II; and (iii) Fourth Amendment Claim

(Search of Home) - Count III.  See Complaint at 5-8.  Garcia also alleges two state violations:

(i) State Constitutional, False Imprisonment, and Tort Claims - Count IV; and (ii) Defamation of

---

Buccal Swabs," Molecular Biology Today, 3: 51-54 (2002) available at
www.horizonpress.com/mbt/v/v3/07.pdf (last visited October 2011)).  While Garcia points to some
evidence that DNA extraction from urine is possible, Garcia presents no evidence to controvert the
asserted fact that the New Mexico Department of Public Safety Forensic Laboratory is incapable of
performing this analysis.  Because Garcia has not specifically controverted the Defendants' asserted
fact, the Court will deem this fact admitted.  See D.N.M.LR-Civ. 56.1(b).

[31]In State v. Kilpatrick the Court of Appeals of New Mexico discussed a defendant's right
to a speedy trial, guaranteed under the Sixth Amendment to the United States Constitution and
Article II, Section 14 of the New Mexico Constitution, and remanded the case with instructions to
dismiss the charges against the defendant because the delay in prosecution violated the defendant's
right to a speedy trial.  See 104 N.M. at 446, 722 P.2d at 697.

Character - Count V.  <u>See</u> Complaint at 8.  The Defendants removed the case pursuant to 28 U.S.C.

§§ 1441(b) and 1446(a)-(b).  <u>See</u> Notice of Removal, filed January 5, 2011 (Doc. 1).  The

Defendants answered the Complaint on January 12, 2011.  <u>See</u> Defendants Monica Casaus and the

City of Rio Rancho's Answer to Complaint to Recover Damages for Deprivation of Civil Rights,

filed January 12, 2011 (Doc. 5)("Answer").  The Defendants then filed an amended answer to the

Complaint.  <u>See</u> Defendants Monica Casaus and the City of Rio Rancho's Amended Answer to

Complaint to Recover Damages for Deprivation of Civil Rights (Errata on Second Affirmative

Defense), filed January 12, 2011 (Doc. 6)("Amended Answer").  In their Amended Answer, the

Defendants denied the majority of facts sets out in the Complaint and denied the allegations

contained in all counts.  <u>See</u> Amended Answer at 2-7.  The Defendants also asserted seven

affirmative defenses: (i) that the NMTCA bars the claims against the City of Rio Rancho, for failure

to provide the Notice of Claim that the NMTCA requires; (ii) that the NMTCA bars a post-judgment

interest award; (iii) that the NMTCA bars a punitive damages or attorney's fees award, with respect

to the state tort claims; (iv) that Garcia fails to state a defamation claim, because any of Casaus'

statements in arrest warrant affidavits or during her grand-jury testimony are absolutely privileged

and not a "communication" for defamation purposes; (v) that there is no applicable waiver of

sovereign immunity for Garcia's state constitutional claim under the NMTCA; (vi) that Garcia fails

to state a "selective prosecution claim" under both federal and state law; and (vii) that Casaus is

entitled to qualified immunity as to the federal claims against her, and to the defense of qualified

immunity or good faith as to the state court claims against her.  Amended Answer at 7-8.  The

Defendants also reserved the right to assert additional affirmative defenses based on discovery.  <u>See</u>

Amended Answer at 8.

-34-

On September 21, 2011, Garcia filed his Unopposed Motion to Dismiss Count III (Unlawful Search of Home) Against Defendants with Prejudice.  See Doc. 36.  The Court approved the stipulated dismissal and dismissed Count III of the Complaint with prejudice.  See Order of Dismissal of Count III, filed September 27, 2011 (Doc. 37).

On October 7, 2011, the Defendants filed their Motion for Summary Judgment.  See Doc. 41.  The Defendants assert that the primary issue is whether Casaus had probable cause to arrest Garcia and, if she did, all of Garcia's other claims must fail.  See MSJ at 19.  The Defendants argue that probable cause existed based on K.J.'s disclosures on January 27, 2010.  See MSJ at 19.  The Defendants contend that Casaus had probable cause to arrest Garcia because: (i) "punching, choking and urinating on a child with one's penis both in and out of the child's mouth is harmful to the child . . . and it constitutes a violation of the three criminal statutes with which Plaintiff was ultimately charged;" and (ii) on January 27, 2010, there was "ample evidence of Plaintiff's violation of at least two of the three criminal statutes with which he was ultimately charged."  MSJ at 19-20.  In support of their contention that "ample evidence" existed on January 27, 2010, the Defendants rely on the following facts: (i) K.J.'s statements that he was punched, he was choked, his pants were pulled down, and Garcia laid down next to him in bed; (ii) the first two statements were made to an adult friend of K.J.'s mother who discovered the child ten feet from Garcia; (iii) K.J.'s bed and Garcia's pants were both wet; (iv) Garcia could not explain the K.J.'s  condition or Garcia's wet pants when Katz inquired and then locked himself in a bathroom; and (v) Garcia stated that he had no recollection of being close to K.J. or being confronted about his condition.  MSJ at 20.  The Defendants dispute Garcia's allegation that the City of Rio Rancho or Casaus rushed to arrest him.  See MSJ at 20-21.  The Defendants assert that, before arresting Garcia, Casaus arranged an

interview of K.J. with All Faiths Receiving Home, which Casaus had reason to believe had trained forensic interviewers.  See MSJ at 21.  The Defendants assert that K.J. confirmed his earlier statements and that there was no reason to doubt the veracity of his statements.  See MSJ at 21.  K.J. also made new allegations about Garcia urinating on him and demonstrated what occurred using anatomically correct dolls.  See MSJ at 21-22.

The Defendants argue that Garcia must show that Casaus lacked probable cause to arrest him for any crime.  See MSJ at 22 (citing Devenpeck v. Alford, 543 U.S. 146 (2004); Apodaca v. City of Albuquerque, 443 F.3d 1286, 1289 (10th Cir. 2006)).  Furthermore, the Defendants argue that, under New Mexico law, K.J.'s statements to his mother were evidence that a crime was committed. See MSJ at 23.  The Defendants further assert that the Court must determine whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause.  See MSJ at 24.  The Defendants contend that, as probable cause for the arrest, Casaus relied on K.J.'s statements on January 27, 2010 and his statements on February 12, 2010.  See MSJ at 26. Chief Judge Louis P. McDonald determined that the arrest warrant affidavit set forth probable cause, and the Defendants argue that Chief Judge McDonald's decision is entitled to great weight.  See MSJ at 26.  The Defendants admit that, with four police reports, two witness statements, and a safe-house interview, some information may have been left out of the arrest warrant affidavit.  See MSJ at 27.  Additionally, the Defendants point out that, at the time Casaus wrote the affidavit, the safe-house interview had not been transcribed and that urgent action was necessary, because Garcia's children were in his custody.  See MSJ at 27.  They argue that Casaus fairly represented the totality of the circumstances and could not, and should not, have known that any information was unreliable. See MSJ at 27.

-36-

Addressing Garcia's allegations of an inadequate investigation, the Defendants assert that Garcia failed to provide the "speculative leads" that he now contends Casaus should have investigated when he was interviewed.  <u>See</u> MSJ at 28.  The Defendants contend that other police officers interviewed Katz and Odom at the scene on January 27, 2010.  <u>See</u> MSJ at 29.  The Defendants allege that, if there was any deficiency in the investigation, it was quickly cured when Casaus continued to investigate.  <u>See</u> MSJ at 29.  The Defendants state that Garcia admitted to irresponsible, drunken behavior around children and could not recall whether he peed on K.J. on January 27, 2010.  <u>See</u> MSJ at 30.  The Defendants also invoke qualified immunity for Casaus, because there was arguable probable cause.  <u>See</u> MSJ at 30.  Under the doctrine of qualified immunity, the Defendants argue that Casaus only had to have "arguable" probable cause.  <u>See</u> MSJ at 31 (citing <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987)).  The Defendants contend that Casaus did not have fair notice that: (i) her reliance on the information acquired by other officers at the scene was constitutional; (ii) she could not rely on the information the forensic examiner acquired; and (iii) any particular observation she made evaluating the totality of the evidence should have been, but was not, included in her arrest warrant affidavit.  <u>See</u> MSJ at 32.

The Defendants assert that, if there was not probable cause, their liability ceased when the prosecutor dismissed the charges and submitted the case to a grand jury.  <u>See</u> MSJ at 33.  The Defendants contend that Casaus did not withhold any information from the Thirteenth Judicial District Deputy District Attorney.  <u>See</u> MSJ at 34.  The Defendants argue that Casaus had no duty to investigate further once the Office of the District Attorney of the Thirteenth Judicial District took over the case and obtained a grand jury indictment.  <u>See</u> MSJ at 35.  As to the federal malicious prosecution claim, the Defendants contend Garcia cannot establish that there was no probable cause,

that the original action terminated in his favor, or that Casaus acted with malice.  <u>See</u> MSJ at 36-37.

With respect to the City of Rio Rancho's liability, the Defendants assert that there is basis for

municipal liability under 42 U.S.C. § 1983, because Casaus, the municipal employee, did not violate

any of Garcia's constitutional rights.  <u>See</u> MSJ at 38.  State law, regarding respondeat superior, also

requires that there must be underlying liability, and the Defendants argue that Garcia cannot

establish that Casaus is liable for any violation.  <u>See</u> MSJ at 39.

Turning to the state law claims, the Defendants argue that Garcia cannot establish his

defamation claim, because all of Casaus' statements in the arrest warrant affidavit and to the grand

jury are privileged.  <u>See</u> MSJ at 39.  The Defendants further assert that Garcia cannot establish his

state false-arrest and false-imprisonment claims, because lack of probable cause is an element of

each.  <u>See</u> MSJ at 40-41.

On October 21, 2011, Garcia filed his Response.  <u>See</u> Doc. 46.  Garcia asserts that there are

many genuine issues of material fact.  <u>See</u> Response at 10.  Garcia argues that the parties cannot

agree what occurred on the night of the incident resulting in his arrest, because the Defendants still

contend Garcia is guilty of the crimes of which he was accused.  <u>See</u> Response at 10.  Garcia also

contends that the parties disagree as to the quality and credibility of Odom's, Katz', and K.J.'s

witness statements.  <u>See</u> Response at 11.  He asserts that failing to interview readily accessible

witnesses, before making an arrest, is unconstitutional.  <u>See</u> Response at 13.  Garcia argues that

because Casaus did not personally interview Katz and Odom, but credited their statements, she acted

unreasonably and had a biased perspective.  <u>See</u> Response at 13.  Furthermore, Garcia asserts that

Casaus "failed to understand her heightened duty as a neutral police investigator, with a duty to

collect both incriminating and exculpatory evidence, regardless of how that evidence would later

be used in court." Response at 13.  Garcia contends that during Casaus' interview with Garcia, Casaus revealed her bias further, because she interpreted and characterized K.J.'s statements in a way that would tend to incriminate him.  See Response at 14.  Garcia asserts that the fact that the parties dispute whether probable cause existed to arrest him also presents a genuine issue of material fact.  See Response at 15.

Discussing the probable cause standard, Garcia argues that the Court is limited to the available information on which Casaus relied -- namely K.J.'s safe-house interview and any exculpatory information.  See Response at 17.  Garcia asserts that Katz' and Odom's statements were unreliable, because they were both drunk and had motivation to lie to implicate Garcia.  See Response at 18.  In determining whether probable cause exists, Garcia states that the Court must consider the totality of circumstances and argues that Casaus did not consider any exculpatory evidence.  See Response at 19.  Garcia represents that Casaus should have known that failing to formally interview Odom, Katz, the neighbors, his two children, and Katz' child, or personally interview K.J., violates his constitutional rights.  See Response at 20.  Garcia argues that, had Casaus interviewed him before arresting him, she would have discovered Katz' and Odom's motivation to lie.  See Response at 21.

Garcia asserts that he has introduced evidence that the City of Rio Rancho was negligent and/or reckless in contracting with entities who conduct "scientifically outdated safe-house interviews."  Response at 22.  Garcia contends that using anatomically correct dolls and waiting sixteen days to conduct an interview demonstrate the problems with the safe-house interview.  See Response at 22.  Garcia argues that a reasonable fact-finder could conclude that the City of Rio Rancho is responsible for violating the Constitution, because it has no quality control standards for

safe-house interviews.  See Response at 23.  Garcia asserts that Casaus is not permitted to blindly rely on the safe-house interview and that the City of Rio Rancho is responsible for establishing reasonable controls on the reliability of information its contractors provide.  See Response at 24. Garcia further asserts that the City of Rio Rancho failed to train Casaus how to conduct a proper child abuse investigation.  See Response at 24-25.  Garcia states that, if a fact-finder determines that probable cause did not exist, the City of Rio Rancho may be held liable under the doctrine of respondeat superior.  See Response at 25.  Garcia contends that Casaus violated established policy, because she did not personally interview any of the individuals involved in the case before arresting him.  See Response at 26.  Additionally, Garcia argues, Casaus made no attempt to determine whether K.J. understood the difference between fact and fiction.  See Response at 28.

Garcia asserts that a reasonable fact-finder could determine that the Defendants' investigation was inadequate, because it was not based on "the independent evidence necessary to produce reasonably trustworthy information."  Response at 28.  Garcia contends that numerous inconsistencies indicate reasons to doubt K.J., Odom, and Katz' testimony.  See Response at 28. Garcia argues that K.J. stated that: (i) the police shot Garcia on the night of the incident; (ii) Garcia peed on Odom and Katz; (iii) he was surrounded by other witnesses and imaginary friends; (iv) the "kid's dad" committed the alleged acts; (v) he was choked with a hammer, which was never retrieved as physical evidence; (vi) Katz' son lives at that safe-house; and (vii) Garcia attempted to steal his scooter.  Response at 29-33.  Garcia further argues that, given K.J.'s inconsistent statements and his failure to name Garcia directly as the perpetrator, Casaus should have conducted interviews with other witnesses.  See Response at 29.  Garcia states that K.J.'s interview is tainted, because he used the word "safe-house" despite Casaus' instruction to Odom that she not talk to K.J. about the

interview.  Response at 30-31.  Garcia argues that the techniques used during the safe-house interview were "sub-standard, archaic, and not employing up-to-date, prevailing scientific methodology."  Response at 31.  Additionally, Garcia contends, K.J.'s accusations evolved over the course of the interview, becoming more elaborate, and had no evidentiary support.  See Response at 32.  Addressing the credibility of other witnesses, Garcia asserts Odom and Katz were not reliable, impartial witnesses, because: (i) Katz had a former sexual relationship with Garcia; (ii) Odom sexually assaulted Garcia on the night in question; and (iii) Odom and Katz were heavily intoxicated on the night in question.  See Response at 33.  Furthermore, Garcia asserts, a reasonable investigator would have recognized this bias.  See Response at 33.  Garcia argues that Casaus unreasonably failed to collect, preserve, or make further inquiry into several categories of physical evidence before arresting him, including: (i) failing to photograph K.J. on the night in question; (ii) failing to collect K.J.'s clothing as evidence; (iii) failing to locate the hammer allegedly used to choke K.J.; and (iv) failing to test the liquid on the bed sheets.  See Response at 34.  Garcia also argues that a reasonable jury could conclude that Casaus' failure to disclose these weaknesses to the grand jury could have materially altered its decision to indict him.  See Response at 34.

Addressing his state law claims, Garcia contends that he has stated valid state constitutional and tort claims for which relief may be granted.  See Response at 36.  Garcia argues that Casaus does not have absolute immunity for those torts, and that she is not entitled to "a belated finding of qualified immunity as to the false imprisonment, malicious prosecution, false arrest, or N.M. Const. Art. II Sec. 10 claims."  Response at 36.  Garcia argues that Casaus has not made a threshold showing that her statements were "relevant" to the grand-jury proceeding.  Response at 37.  Garcia points to Casaus' statements that a "Mr. Mitchell" had been identified as the perpetrator and argues

that these statements are demonstrably false, such that she is not entitled to absolute immunity. Response at 37-38.  Garcia further asserts that Casaus testified before the grand jury that he told officers at the scene that "those kids" were responsible for his wet pants, but no officer reported such a statement.  Response at 38.  Garcia states that the "those kids" statement came from Katz who then told police officers.  Response at 38-39.  Garcia contends that sovereign immunity is waived under the NMTCA and that the Court should not grant summary judgment in favor of the Defendants on his state claims.  See Response at 40.

On November 3, 2011, the Defendants filed their Reply.  See Doc. 50.  The Defendants assert that Garcia's Response is "a scattershot that is hard to comprehend due in part to the fact that Plaintiff has not complied with our Local Rules on summary judgment."  Reply at 1.  The Defendants argue that Casaus conducted a reasonable investigation.  See Reply at 5.  They contend that it is undisputed that, at the time of Garcia's arrest, the Defendants had in their possession: (i) Lepori's written report, in which he relates K.J.'s statement that "the man" choked him and had his hands down his pants, Katz' statement that K.J. told her that the man pulled down his pants, and Odom's statement that K.J. told her that Garcia choked him; (ii) Katz' hand-written statement that K.J. told her that Garcia choked him; (iii) Odom's hand-written statement that K.J. told her that Garcia pulled down his pants and choked him; (iv) Phelps' written report stating that K.J. told him that Garcia hit him on the head and elbowed him; (v) Thacker's written report in which Garcia denied choking a five-year-old child, but admitted to consuming a large amount of alcohol; and (vi) K.J.'s safe-house interview in which he reported that Garcia punched him and peed in his mouth.  Reply at 5.  Responding to Garcia's argument that Casaus should have conducted "formal interviews" of other witnesses, the Defendants contend that Garcia did not include in his Response

statements from any of those individuals or explain how their statements would have undermined a finding of probable cause. Reply at 5. The Defendants point out that Garcia's argument rests on the supposition that "if Casaus had conducted additional investigation she might have found information that might have supported his theory that he was framed." Reply at 5-6 (emphasis original). The Defendants further argue that Garcia has not provided any factual support for his theory, beyond the fact that his DNA was not found on the wet sheets. See Reply at 6.

The Defendants further argue that Garcia did not raise his theory that he was framed before initiating this suit. See Reply at 7. Relying on Davis v. Tavares, No. 09-4066, 2011 WL 53440 (N.D. Ill. 2011), the Defendants assert that police officers are not required to rule on the veracity of a victim's claim. See Reply at 7-8. Additionally, the Defendants contend that, even if Casaus had conducted some further investigation, she would not have become aware of any bias, because Garcia did not allege that Katz and Odom were biased until well after his arrest. See Reply at 8. The Defendants point out that, in her deposition and in her arrest-warrant affidavit, Casaus states that she relied on information for her probable cause determination and any contention that she relied solely on the safe-house interview is without merit. See Reply at 9. Although Garcia "disagrees as to the quality and credibility" of Katz' and Odom's statements, the Defendants assert that this disagreement does not preclude summary judgment in the Defendants' favor. Reply at 9. Furthermore, the Defendants argue that "the mere fact that a five-year-old child makes inconsistent or confusing statements during a Safe House interview is not grounds for a finding that probable cause does not exist." Reply at 10. In relation to the safe-house interview, the Defendants deny that Casaus improperly relied on K.J.'s statements to the safe-house interviewer. See Reply at 11. The Defendants argue that, even if these methods were improper, Garcia presented no evidence that the

-43-

Defendants were aware or had any reason to believe that the safe-house techniques were improper. See Reply at 11.

The Defendants contend that Garcia does not dispute that Casaus is entitled to qualified immunity, but instead argues that the qualified immunity should be denied as "belated." Reply at 12. The Defendants respond that Garcia's argument is without merit, because the defense of qualified immunity may be raised at any time. See Reply at 12. Moreover, the Defendants assert that Garcia's post-arrest statements would establish probable cause and that his damages, if any, would be limited to a two-hour window. See Reply at 13. With respect to the claims of municipal liability, the Defendants argue that there is no underlying constitutional violation and that Garcia's claim that the City of Rio Rancho failed to adequately train Casaus requires expert testimony, which Garcia has not put forward. See Reply at 14.

On November 21, 2011, the Court held a hearing. The Defendants stated that Casaus' arrest warrant affidavit does set forth probable cause. See Transcript of Hearing at 4:2-5 (November 21, 2011)(Gould)("Tr.").[32] The Defendants pointed out that Chief Judge McDonald and the grand jury both found that the arrest warrant affidavit set forth probable cause. See Tr. at 4:5-11 (Gould). The Defendants asserted that Garcia attacked the truthfulness of the affidavit, but represented that Garcia does not point to any fact that is patently false or would be more than inadvertence or negligence. See Tr. at 4:14-21 (Gould). Further addressing this argument, the Defendants argued that, viewing the totality of the facts, no facts suggest that Casaus acted with intention or a reckless disregard for the truth. See Tr. at 4:22-5:3 (Gould). The Court asked whether the facts of the night in question

---

[32]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

are disputed and whether it was established that someone urinated on the child.  <u>See</u> Tr. at 5:19-24 (Court).  In response, the Defendants stated that there was a consistent allegation of hitting, punching, and choking -- essentially child abuse.  <u>See</u> Tr. at 5:24-6:5 (Gould).  The Defendants represented that, consistent with policy, interviews of the child on that evening were curtailed and a safe-house interview was conducted.  <u>See</u> Tr. at 6:6-8 (Gould).  The Defendants asserted that, after the safe-house interview, the child consistently stated that there was choking, hitting, and that pants were pulled down.  <u>See</u> Tr. at 6:9-14 (Gould).  The Defendants stated that their position, regardless of other accusations of urination, is that those allegations were enough to form the basis of a legitimate arrest based on probable cause.  <u>See</u> Tr. at 6:15-18 (Gould).  At the February 12, 2010 safe-house interview, the Defendants represented that K.J. alleged that Garcia urinated in his mouth and attempted to urinate on his back, but asserted that it can be presumed that a five-year old would be ignorant of what ejaculation is.  <u>See</u> Tr. at 6:19-7:3 (Gould).  The Defendants admitted that there was no physical evidence of semen, and that the laboratory where the bed sheets were sent was not capable of determining whether the liquid on them was water, urine, or beer.  <u>See</u> Tr. at 7:8-14 (Gould).  The Defendants reiterated, however, that, regardless of any additional statements at the safe-house interview, there was probable cause to arrest based upon the hitting, punching, choking, and pulling down of pants.  <u>See</u> Tr. at 7:15-20 (Gould).

Turning to the arrest warrant affidavit, the Defendants contended that, on its face, there is probable cause, because there were no material misstatements of facts, and nothing was deliberately hidden or purposefully excluded.  <u>See</u> Tr. at 7:21-8:1 (Gould).  The Defendants argued that Garcia's allegation is that Casaus should have conducted a more thorough investigation.  <u>See</u> Tr. at 8:1-4 (Gould).  The Defendants characterized Garcia's argument as complaining that all Casaus had to do

-45-

was interview him before the arrest and she would have discovered that the two adults had reason to fabricated the allegations against him. See Tr. at 8:8-14 (Gould). The Defendants challenged this argument and contended that Garcia had three opportunities to inform the police about this alleged bias: (i) on January 27, 2010, Garcia spoke with police officers about the incident and did not disclose the adults' bias or allege that the allegations were fabricated; (ii) when he was interviewed following his arrest, Garcia did not inform Casaus that the allegations were false or state that the adults were biased; and (iii) he received a target letter before the grand jury convened and did not come forward to present his assertions that the allegations against him were the product of bias. See Tr. at 8:20-9:10 (Gould). Additionally, the Defendants asserted that, even if Garcia had told Casaus that the allegations were fabricated, such defense would not have mandated that there was no probable cause, because Casaus did not have to accept Garcia's statements. See Tr. at 9:19-24 (Gould). Addressing Garcia's cited cases, the Defendants argued that they are distinguishable, because, in those cases, the plaintiff came forward with a proffer of what would have been discovered if there had been a more thorough investigation. See Tr. at 10:5-16 (Gould). The Defendants contended that Garcia has offered no evidence that Casaus would have discovered any exculpatory information and does nothing more than say Casaus should have done more. See Tr. at 10:17-11:3 (Gould).

Finally, the Defendants asserted that the case law indicates that, when dealing with children some inconsistencies or confusion should be expected, and does not negate probable cause. See Tr. at 11:6-10 (Gould). Responding to Garcia's expert, the Defendants represented that Dr. Susan Cave's position is that the safe-house interview was not conducted in an optimal manner and that it is, therefore, unacceptable. See Tr. at 11:15-20 (Gould). The Defendants asserted that there is no

constitutional right to an optimal interrogation.  See Tr. at 11:21-25 (Gould).

Garcia argued that a plaintiff is entitled to his day in court in cases such as this one, because he never received that day in court during the criminal portion of this case.  See Tr. at 12:14-18 (Garcia).  Garcia asserted that there are numerous material facts in dispute.  See Tr. at 13:6-11 (Garcia).  Garcia stated that there are only two eyewitnesses to the entire incident, himself and K.J..  See Tr. at 13:12-18 (Garcia).   Turning to K.J.'s accusations, Garcia pointed out that K.J.'s statements were made through Katz, who reported the accusations to the police officers.  See Tr. at 13:19-23 (Garcia).  Garcia represented that, while there were statements from Katz and K.J.'s mother, Odom, there are no direct statements from K.J. on the night of the incident.  See Tr. at 13:23-14:1 (Garcia).  Garcia argued that Katz had motivation to lie and was not an impartial witness. See Tr. at 14:7-8 (Garcia).  Garcia further argued that all three adults present that evening were unreliable witnesses, because they had been drinking heavily.  See Tr. at 14:9-13 (Garcia).  The Court then asked what an officer is supposed to do when confronted with drunk witnesses and how far should an officer go in discounting those statements.  See Tr. at 14:15-15:2 (Court).  In response, Garcia contended that, for contradictory eyewitness testimony to establish probable cause, there must be something more, either physical evidence or corroborating witnesses, and relied on Spiegel v. Cortese, 966 F.Supp. 684 (N.D. Ill. 1997) for the probable cause standard.  See Tr. at 15:3-13 (Garcia).  Relying on Jones v. City and Cnty. of Denver, 854 F.2d 1206 (1988), Garcia further argued that, to find probable cause, the police need something more than contradictory statements from a single eyewitness.  See Tr. 15:14-17 (Garcia).  Garcia asserted that K.J.'s testimony is inconsistent across the board and that there is no physical evidence, because no one has determined what was on the bed sheets.  See Tr. at 15:18-25 (Garcia).  Garcia argued that Casaus admitted that

-47-

there was no emergency necessitating his arrest, but she rushed to arrest him after the safe-house interview.  <u>See</u> Tr. at 16:1-7 (Garcia).  Garcia contended that a reviewing police officer has a duty of reasonable care to conduct a reasonable investigation and to ensure that their information is reliable.  <u>See</u> Tr. at 17:12-19 (Garcia).  Discussing the appropriate standard, Garcia argued that under <u>Illinois v. Gates</u>, 462 U.S. 213 (1983), when reviewing whether there was probable cause to arrest, the Court should determine what a reasonable officer would do.  <u>See</u> Tr. at 17:20-18:1 (Garcia).  Garcia asserted that, after watching the safe-house interview, Casaus should have seen the contradictory statements and taken additional steps to investigate whether a crime had occurred. <u>See</u> Tr. at 18:2-7 (Garcia).

Garcia represented that, had Casaus conducted a reasonable investigation, she would have discovered that he was "basically sexually assaulted" by Odom and that he had turned Odom down. Tr. at 18:15-20 (Garcia).  Responding to the Defendants' contention that he had three opportunities to tell the police about possible bias, Garcia argued that the first alleged opportunity occurred at a gas station and was not a "real opportunity," because he was bleeding and the responding officers merely transcribed all the events.  Tr. at 19:6-12, 19:17-24 (Garcia).  Garcia contended that the Defendants' second and third opportunities only occurred after he was arrested, and the Court should not consider them in determining whether there was probable cause.  <u>See</u> Tr. at 20:4-21:9 (Garcia). Arguing that there is a lack of physical evidence, Garcia asserted that: (i) there are no photographs of K.J. on the night in question; (ii) K.J.'s clothing was dry; (iii) no one has determined what substance wet the bed sheets; and (iv) his clothing was not collected that night.  <u>See</u> Tr. at 22:9-23:2 (Garcia).  Garcia stated that, if this case were to proceed to trial, he would testify that he does not remember whether he spilled beer on himself or urinated on himself.  <u>See</u> Tr. at 23:1-5 (Garcia).

He asserted that he does remember spilling beer on himself and that this accident made him a prime target for two individuals to falsely implicate him for the alleged crimes.  See Tr. at 23:4-9 (Garcia). Garcia admitted that there is a picture of him on the morning of January 27, 2010 with a wet spot on his pants.  See Tr. at 23:20-25 (Court, Garcia).

Garcia contended that Casaus has admitted that she considered all forms of exculpatory evidence irrelevant.  See Tr. at 24:1-3 (Garcia).  Garcia argued that this concession is an example of how Casaus did not act as an impartial investigator.  See Tr. at 24:11-15 (Garcia).  Garcia further asserted that there are indications throughout the safe-house interview that K.J.'s testimony is unreliable.  See Tr. at 24:16-18.  First, Garcia argued that K.J. stated that he and his mother watched a movie about "an imaginary friend, a friend that has yet to be identified, named Andy being a girl" before the safe-house interview.  Tr. at 24:18-22 (Garcia).  Garcia asserted that he does not know the substance of the movie, who Andy is, or why K.J. watched the movie before the safe-house interview.  See Tr. at 24:22-25 (Garcia).  Second, Garcia contended that some of the information that K.J. provided could not possibly have been true, because K.J. stated that Garcia urinated on Odom and Katz.  See Tr. at 25:8-9 (Garcia).  Garcia argued that Casaus ignored that statement.  See Tr. at 25:10 (Garcia).  Third, Garcia asserted that K.J. told the interviewer that Garcia was shot on the night in question, which is untrue.  See Tr. at 25:11-13 (Garcia).  Garcia requested that the Court thoroughly parse through K.J.'s statements and examine the facts for factual disputes.  See Tr. at 25:23-26:6 (Garcia).  Garcia argued that the Court, under Williams ex rel. Allen v. Cambridge Bd. of Educ., 370 F.3d 630 (6th Cir. 2004), should look to the totality of the circumstances, including exculpatory information Casaus ignored, before making the arrest.  See Tr. at 26:8-12 (Garcia). Garcia also contended that the Court should exclude any false information, particularly two of

-49-

Casaus' statements before the grand jury.  See Tr. at 26:13-16 (Garcia).  First, Garcia argued that K.J. never directly implicated Garcia, but Casaus' testimony before the grand jury suggests that K.J. identified the perpetrator as "Mr. Mitchell."  Tr. at 26:16-25 (Garcia).  Garcia suggested that, if he were a grand juror, he would consider this testimony an indication of guilt and argued that Casaus had a duty to inform the grand jury that K.J. never directly implicated Garcia.  See Tr. at 27:7-16 (Garcia).  Second, Garcia asserted that Casaus testified that he said "the word kids when asked why his pant were wet."  Tr. at 27:17-19 (Garcia).  Garcia argued that this statement did not come directly from him, but rather came from Katz' written statement, and he denied having made the statement.  See Tr. at 27:19-28:3 (Garcia).

Garcia contended that, at summary judgment, all reasonable inferences must be made in his favor.  See Tr. at 28:4-8 (Garcia).  Garcia asserted that there are disputes about: (i) probable cause; (ii) what occurred on the night in question; (iii) the characterization and credibility of the testimony; and (iv) whether Casaus conduct fell below the reasonable standard of care and below standard operating procedures.  See Tr. at 28:11-16 (Garcia).  Garcia argued that, following the 120 days he spent in custody, he: (i) lost the house he was renting; (ii) was estranged from his kids; (iii) was presumed guilty; (iv) lost his car; and (v) lost his job.  See Tr. at 29:8-15 (Garcia).  Garcia also conceded that the Court should dismiss the trespassing component of his state claims, because he admits there was no search.  See Tr. at 30:2-14 (Court, Garcia).

Responding to Garcia's arguments about his damages, the Defendants asserted that those facts are not in the record and that, at the time of his arrest, Garcia was unemployed.  See Tr. at 30:17-24 (Gould).  The Defendants argued that two police officers spoke to K.J. on January 27, 2010 and heard his accusations -- the accusations did not come only  from Katz or Odom.  See Tr. at 31:5-

15 (Gould).  The Defendants conceded that K.J. did not refer to Garcia as Mr. Mitchell, but referred to him as "the kids' dad" and the only children there were Garcia's.  Tr. at 31:21-22:3 (Gould). Addressing conflicting testimony, the Defendants asserted that the adults, Katz and Odom, were consistent in their statements.  See Tr. at 32:4-10 (Gould).  On the issue whether there was an emergency, the Defendants conceded that there was no emergency, because K.J. would have no more contact with Garcia; however, the Defendants argued that, after the safe-house interview, there were concerns about Garcia's children, because he had sole custody of them and K.J. was accusing him of child abuse.  See Tr. at 32:11-33:2 (Gould).  The Defendants also admit that the Court should disregard Casaus' interrogation of Garcia for the purposes of determining probable cause, but argue that it is pertinent to refute Garcia's argument that all Casaus had to do was ask some questions to discover whether Katz and Odom were biased.  See Tr. at 33:4-23 (Gould).

The Defendants contended that the dispute over probable cause, a factually intense inquiry, does not mean that there are factual issues in dispute.  See Tr. at 33:24-34:2 (Gould).  The Defendants asserted that, although Garcia appears to dispute Katz' and Odom's statements, for the purposes of probable cause, it is not what they said, but what Casaus considered at the time she made her decision to arrest that is material for probable cause.  See Tr. at 34:2-10 (Gould). Furthermore, the Defendants asserted that Garcia's testimony is that he does not remember anything, and they do not believe that he can make an issue of fact from Katz and Odom's statements when he was drunk.  See Tr. at 34:15-21 (Gould).  Moreover, the Defendants argued that whether Garcia was interviewed pre- or post-arrest is irrelevant, because Garcia's statement when interrogated was that "when I get drunk, I urinate all over the place" and that he did not know whether he urinated on K.J.  Tr. at 34:22-35:7 (Gould).  The Defendants asserted that, had the interview occurred first,

it would have confirmed that there was probable cause to believe Garcia urinated on K.J.  See Tr. at 35:9-11 (Gould).  The Defendants noted that, when asked about how his pants became wet in the interrogation, Garcia disclaimed any knowledge of how his pants became wet.  See Tr. at 36:8-15 (Gould).  The Defendants argued that Garcia did not state that he recalled spilling beer on himself until his deposition a few months ago.  See Tr. at 36:16-19 (Gould).

Turning to the safe-house interview, the Defendants explained that there is no "Andy"; rather, K.J. said "and he," and the interviewer misunderstood that phrase as "Andy."  Tr. at 37:2-8 (Gould).  The Defendants also stated that there are several versions of the safe-house transcript.  See Tr. at 8-14 (Gould).  The Defendants conceded that K.J. made some fanciful statements, but argued that those kinds of statements are not unusual when dealing with a five-year old child.  See Tr. at 37:15-20 (Gould).  The Defendants contended that the cases indicate that a child's confusing and sometimes contradictory statements do not negate probable cause or otherwise credible evidence. See Tr. at 37:21-24 (Gould).  Again, the Defendants argued that the factual nature of probable cause does not preclude summary judgment.  See Tr. at 38:1-5 (Gould).  The Defendants further asserted that credibility is always an issue, but that Garcia's statements about his urination habits while drunk is consistent with what K.J. said.  See Tr. at 38:6-22 (Gould).

On the issue of qualified immunity, the Defendants argued that no evidence suggests that Casaus acted in a manner which she knew or should have known was contrary to established law. See Tr. at 39:5-9 (Gould).  The Defendants asserted that questions of what weight to give a child's statements are extremely difficult and there is no bright-line rule.  See Tr. at 39:10-17 (Gould).  The Defendants contended that there is no evidence of malice and the issue of probable cause will likely control on the malicious prosecution claim.  See Tr. at 39:18-23 (Gould).  As to municipal liability,

-52-

the Defendants argued that Garcia put forward no evidence that the safe-house interview violated constitutional protections or evidenced deliberated indifference.  See Tr. at 39:24-40:8 (Gould).

Garcia stated that he was an independent contractor in between jobs at the time of the incident and that afterwards he has had a difficult time finding work.  See Tr. at 40:21-25 (Garcia). Addressing the police officer's reports of K.J.'s statements, Garcia argued that: (i) he does not know when that report was filed; (ii) the statement is not accurate, because it says K.J. called the perpetrator Mr. Mitchell; and (iii) it seems likely that the reports reflect Casaus' words relayed through the officers.  See Tr. at 41:6-24 (Garcia).  Regarding municipal liability, Garcia asserted that Casaus had no training on constitutional rights and that she is conducting child abuse investigations without any specialized training.  See Tr. at 41:25-42:6 (Garcia).  Garcia contended that his expert brought to light numerous issues with the safe-house interview and that a municipality may be liable for matters of negligent training related to subcontractors.  See Tr. at 42:7-16 (Garcia).  Finally, Garcia encouraged the Court to watch the safe-house interview to spot issues not communicated through the transcripts.  See Tr. at 42:17-43:3 (Garcia).  Garcia argued that K.J.'s statement that Christian lives at the safe-house is evidence that coaching took place before the interview.  See Tr. at 43:17-44:4 (Garcia).  Garcia pointed out the safe-house interviewer used anatomically correct dolls, which he contended demonstrates that the interviewer was leading K.J.  See Tr. at 44:5-45:2 (Garcia).  In sum, Garcia asserted that there are several factual disputes regarding: (i) the safe-house interview inconsistencies; (ii) what occurred on the night in question; (iii) the existence of probable cause; and (iv) what the City of Rio Rancho's standard operating procedures are.  See Tr. at 45:3-18 (Garcia).  Garcia also argued that under Romero v. Fay, 45 F.3d 1472 (10th Cir. 1995), Casaus was required to interview material witnesses at the scene.  See Tr. at 46:1-6 (Garcia).

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides:

> A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.

Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v.

Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations

omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or federal statute.  See Spielman v. Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if federal law does not create enforceable rights.").  Rather, 42 U.S.C. § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the

-56-

claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Aikins, 487 U.S. 42, 48 (1988).  Broken down differently, a plaintiff

> must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. 09-0281, 2010 WL 1608884, at *11 (D.N.M. Mar. 30, 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to the federal  judiciary to displace state law through the creation of a body of general federal tort law.  See Paul v. Davis, 424 U.S. 693, 701 (1976)(Fourteenth Amendment); Griffin v. Breckenridge, 403 U.S. 88, 101-102 (1971)(civil-rights statute).

   The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable to Bivens[33] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 689 (1978).  Further, the United States Court of Appeals

---

   [33]Bivens v. Six Unknown Named Agents, 403 U.S. 388, 395-397 (1971)(authorizing a federal cause of action for damages under certain constitutional provisions when government officials violate those respective constitutional rights).

for the Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 "unless there

is an affirmative link between the constitutional deprivation and the supervisor's exercise of control

or direction, his personal participation, or his failure to supervise." Kiesling v. Troughton, 107 F.3d

880, 1997 WL 111256, at *2 (10th Cir. 1997)(unpublished table decision)(citing Meade v. Grubbs,

841 F.2d 1512, 1527 (10th Cir. 1988)). They can be held liable only for their own unconstitutional

or illegal policies, and not for the tortious acts of their employees. Supervisory liability requires a

showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d

1299, 1307-08 (10th Cir. 1998)(citations omitted)(internal quotation marks omitted). Cf. Bd. of

Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to

identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that,

through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."

(emphasis in original)).

     The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, and may have even

eliminated, supervisory liability for government officials based on an employee's or subordinate's

constitutional violations. See Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010). The language

that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows:

"Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that

each Government-official defendant, through the official's own individual actions, has violated the

Constitution." 129 S.Ct. at 1948. The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude
> the following basis of § 1983 liability survived it and ultimately resolves this case:
> § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates,
> promulgates, implements, or in some other way possesses responsibility for the
> continued operation of a policy the enforcement (by the defendant-supervisor or her
> subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the

deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct."  Dodds v. Richardson, 614 F.3d at 1200-01.  The specific example that the Tenth Circuit gave to illustrate this principle was Rizzo v. Goode, 423 U.S. 362 (1976), where the plaintiff sought to hold a mayor, police commissioner, and other city officials liable under 42 U.S.C. § 1983 for constitutional violations committed by unnamed individual police officers.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations."  Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

Liability can extend to a municipality for failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect"  a class of persons.  Barney v. Pulsipher, 143 F.3d at 1309 & n.8.  "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable.  Barney v. Pulsipher,

143 F.3d at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found
> absent a pattern of unconstitutional behavior if a violation of federal rights is a
> "highly predictable" or "plainly obvious" consequence of a municipality's action or
> inaction, such as when a municipality fails to train an employee in specific skills
> needed to handle recurring situations, thus presenting an obvious potential for
> constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08.  See Williams ex rel. Hart v. Paint Valley Local Sch.

Dist., 400 F.3d 360, 369 (6th Cir. 2005)("The evidence must show that the need to act is so obvious

that the School Board's 'conscious' decision not to act can be said to amount to a 'policy' of

deliberate indifference to Doe's constitutional rights." (emphasis omitted)).  Most cases, however,

will not fall within this "narrow range of circumstances" without "a pattern of violations."  Barney

v. Pulsipher, 143 F.3d at 1308.

The Court recently addressed municipal liability in Coffey v. United States, CIV 08-0588,

CIV 09-0028, Memorandum Opinion and Order, filed November 28, 2011 (Doc. 113)(Browning,

J.).  There, the Court held that the plaintiff could not establish municipal liability, because she had

not "demonstrated that pattern of violations occurred" where she only pointed to one other incident

of medical neglect at a detention facility.  Coffey v. United States, Memorandum Opinion and Order

at 71.  The Court also found that the plaintiff set forth no facts which indicated that the other

incident on which she relied resulted in a constitutional violation or that the municipal defendant

was on notice of the potential for constitutional violations because of that previous incident.  See

Coffey v. United States, Memorandum Opinion and Order at 73.

## LAW REGARDING MALICIOUS PROSECUTION UNDER THE FOURTH AMENDMENT.

The Tenth Circuit "has recognized the viability of malicious prosecution claims under

-60-

§ 1983." Taylor v. Meacham, 82 F.3d 1556, 1560 (10th Cir. 1996). To establish a malicious-prosecution claim under § 1983, a plaintiff must prove that the defendant initiated or continued a proceeding against him without probable cause. See Becker v. Kroll, 494 F.3d 904, 913-14 (10th Cir. 2007). "Unlike a false arrest or false imprisonment claim, malicious prosecution concerns detention only after the institution of legal process." Wilkins v. DeReyes, 528 F.3d 790, 798 (10th Cir. 2008)(internal quotation marks omitted). "In this context, a Fourth Amendment violation can exist only when a plaintiff alleges the legal process itself to be wrongful." Wilkins v. DeReyes, 528 F.3d at 798.

Under Tenth Circuit case law, a § 1983 malicious-prosecution claim includes the following elements: (i) the defendant caused the plaintiff's continued confinement or prosecution; (ii) the original action terminated in the plaintiff's favor; (iii) no probable cause supported the original arrest, continued confinement, or prosecution; (iv) the defendant acted with malice; and (v) the plaintiff sustained damages. See Wilkins v. DeReyes, 528 F.3d at 799. In a Fourth-Amendment malicious-prosecution case, "the third element deals only with the probable cause determination during the institution of legal process." Wilkins v. DeReyes, 528 F.3d at 799.

When a malicious-prosecution claim is based upon the Fourth Amendment, a plaintiff must -- to prevail -- prove that he was also seized. See Nielander v. Bd. of Cnty. Comm'rs, 582 F.3d 1155, 1165 (10th Cir. 2009)(citing Albright v. Oliver, 510 U.S. 266, 271 (1994)(plurality opinion)); Becker v. Kroll, 494 F.3d 904, 914 (10th Cir. 2007)("In our cases analyzing malicious prosecution under § 1983, we have always proceeded based on a seizure by the state -- arrest or imprisonment.").

The Tenth Circuit recently addressed the scope of seizure under Fourth-Amendment malicious-prosecution claims in Becker v. Kroll. Becker was a physician subjected to a baseless

investigation and prosecution for Medicaid fraud.  Her records were subpoenaed, and she was

threatened with criminal prosecution if she failed to pay a requested settlement, even though an

independent review of her records demonstrated that she had not engaged in any wrongdoing.  When

Becker refused to settle, the state first filed a civil suit against her and then pursued criminal charges.

She was subjected to a preliminary hearing and was bound over for trial, but was never taken into

custody.  The civil and criminal cases were dismissed, but Becker was then subjected to an

administrative proceeding that resulted in a finding that she had not engaged in fraud.  Becker

argued that the Tenth Circuit should adopt a broader theory of seizure, based on the Supreme Court's

decision in Albright v. Oliver.  In that case, the Supreme Court concluded that the Fourteenth

Amendment does not provide a substantive due-process right to be free from prosecution without

probable cause, but left open the possibility that a plaintiff could bring such a claim under the Fourth

Amendment.  See Albright v. Oliver, 510 U.S. at 274-75.  In a concurring opinion to the plurality

opinion, Justice Ginsburg urged the Supreme Court to adopt a non-custodial concept of "continuing

seizure" to account for, under the Fourth Amendment, the harms incident to the control that the state

exercises over a citizen before trial.  See Albright v. Oliver, 510 U.S. at 278-80 (Ginsburg, J.,

concurring).  She opined that seizures for Fourth-Amendment purposes include requiring a person

to post bond, compelling a person to appear in court, and imposing restrictions on a person's right

to interstate travel, all of which might create reputational, emotional, and financial harms.  See 510

U.S. at 278.

     The Tenth Circuit has declined to adopt Justice Ginsburg's "continuing seizure" analysis.

Becker v. Kroll, 494 F.3d at 915 ("To extend liability in cases without a traditional seizure would

expand the notion of seizure beyond recognition and fall into the trap carefully avoided by the

Albright majority -- every charging decision would support a § 1983 malicious prosecution-type claim no matter the context.").  The Tenth Circuit held that "[a] groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty."  Becker v. Kroll, 494 F.3d at 915.  Because Becker never was required to post bond or to appear in court, and alleged no specific restrictions on her freedom of movement -- such as travel restrictions -- the Tenth Circuit found that she was not seized for Fourth Amendment purposes.  See Becker v. Kroll, 494 F.3d at 915-16.

The Tenth Circuit has also held that having to attend trial is insufficient to constitute a Fourth-Amendment seizure for purposes of a malicious-prosecution claim.  The Tenth Circuit has stated:

> We agree with the district court that Lewis and Woodman have failed to put forth sufficient evidence showing they were seized for purposes of the Fourth Amendment. Specifically, the only deprivations of liberty sustained by Lewis are that he had to attend two trials; he had to appeal his harassment convictions after one of the trials; and he was fingerprinted in connection with one of the summons.  Similarly, the only deprivation of liberty sustained by Woodman is that she had to make one, and possibly two, court appearances before the disturbing the peace charge was dismissed.  Because Lewis and Woodman have not shown they sustained any other deprivations of liberty in connection with their receipt of the summonses, they have failed to show they were seized in violation of the Fourth Amendment.

Lewis v. Rock, 48 F.App'x 291, 294 (10th Cir. 2002)(unpublished)(citations omitted).

Other circuits have also declined to recognize pre-trial release conditions such as receiving a summons, posting bond, and appearing in court as a seizure.  See DiBella v. Borough of Beachwood, 407 F.3d 599, 603 (3d Cir. 2005)(finding no cause of action for malicious prosecution because the plaintiffs' attendance at trial did not qualify as a Fourth-Amendment seizure); Kingsland v. City of Miami, 382 F.3d 1220, 1235-36 (11th Cir. 2004)(finding no seizure for Fourth-Amendment purposes when plaintiff was required to post $1000.00 bond, appear at her

arraignment, and travel twice from New Jersey to Florida to defend herself in court); Karam v. City of Burbank, 352 F.3d 1188, 1193-94 (9th Cir. 2003)(required signing of "own recognizance" agreement, which obligated woman falsely accused of a misdemeanor to obtain court's permission before leaving state and which compelled her appearance in court, amounted to de minimis restrictions not constituting a Fourth Amendment seizure); Nieves v. McSweeney, 241 F.3d 46, 56 (1st Cir. 2001)(declining to find a seizure based on compelled presence at numerous pre-trial court appearances and at trial, in the absence of a required bond or travel restrictions); Depiero v. City of Macedonia, 180 F.3d 770, 790 (6th Cir. 1999)(finding no Fourth-Amendment seizure where government conduct consisted of an officer issuing a citation that required a court appearance); Riley v. Dorton, 115 F.3d 1159, 1162 (4th Cir. 1997)(refusing to apply Justice Ginsburg's continuing-seizure theory to a claim of excessive force against pre-trial detainees, instead applying the Due Process Clause of the Fourteenth Amendment, and collecting cases that analyze at what point, short of arrest, an individual may have suffered a deprivation of personal freedom sufficient to implicate the Fourth Amendment).

Some circuits have adopted Justice Ginsburg's continuing-seizure analysis.  The United States Court of Appeals for the Fifth Circuit found a Fourth-Amendment seizure in a case where the defendant was fingerprinted, photographed, and then required to sign a personal recognizance bond, report regularly to Pretrial Services, obtain permission before leaving the state, and provide federal officers with financial and identifying information.  See Evans v. Ball, 168 F.3d 856, 860-61 (5th Cir. 1999).  The United States Court of Appeals for the Second Circuit has ruled travel restrictions and court appearances "are appropriately viewed as seizures within the meaning of the Fourth Amendment."  Murphy v. Lynn, 118 F.3d 938, 946 (2d Cir. 1997).  The United States Court of

Appeals for the Third Circuit, in <u>Gallo v. City of Philadelphia</u>, 161 F.3d 217 (3d Cir. 1998), held that the plaintiff, who was released on bond, never arrested, detained, or handcuffed, was still seized because he was prohibited from traveling beyond New Jersey and Pennsylvania, was compelled to attend all court hearings, and had to contact Pretrial Services weekly. <u>See</u> 161 F.3d at 225. The Tenth Circuit has noted that "[e]ven those courts that subscribe to the line of reasoning endorsed by Justice Ginsburg have recognized a seizure only when criminal charges are coupled with another significant restraint on liberty, such as restrictions on travel." <u>Becker v. Kroll</u>, 494 F.3d at 916.

### FOURTH-AMENDMENT LAW REGARDING PROBABLE CAUSE

An arrest, "characterized by highly intrusive or lengthy search or detention," must be supported by probable cause. <u>Oliver v. Woods</u>, 209 F.3d 1179, 1185 (10th Cir. 2000). <u>See</u> <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985). "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" <u>United States v. Valenzuela</u>, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting <u>United States v. Edwards</u>, 242 F.3d 928, 934 (10th Cir. 2001))(citing <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959)). Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion." <u>United States v. Morris</u>, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).

Probable cause is measured against an objective standard. <u>See</u> <u>Beck v. Ohio</u>, 379 U.S. 89, 96 (1964). "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." <u>United States v. Valenzuela</u>, 365 F.3d at 896-97 (citing <u>Florida v. Royer</u>, 460 U.S. 491, 507 (1983); <u>United States. v. Treto-Haro</u>, 287 F.3d 1000, 1006 (10th

Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

### 1.        Probable Cause and Arrest Warrant Affidavits.

"[A]n arrest is valid and does not violate the Fourth Amendment if the warrant underlying it was supported by probable cause at the time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested." Beard v. City of Northglenn, Colo., 24 F.3d 110, 114 (10th Cir. 1994). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime."  Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir. 1996)(citing Wong Sun v. United States, 371 U.S. 471, 481 n.9 (1963)).

An arrest-warrant affiant violates the Fourth Amendment when he or she "knowingly . . . , or with reckless disregard for the truth," includes false statements in the affidavit, Franks v. Delaware, 438 U.S. 154, 155-56 (1978), or "knowingly or recklessly omit[s] from an arrest affidavit information which, if included, would have vitiated probable cause," Stewart v. Donges, 915 F.2d 572, 582-83 (10th Cir. 1990). See Bruner v. Baker, 506 F.3d 1021, 1026 (10th Cir. 2007).  In a case involving information omitted from an affidavit, the existence of probable cause is determined "by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant."  Wolford v. Lasater, 78 F.3d at 489 (quoting Stewart v. Donges, 915 F.2d at 582 n.13).  In some cases, "[r]ecklessness may be inferred from omission of facts which are clearly critical to a finding of probable cause." DeLoach v. Bevers,

922 F.2d 618, 622 (10th Cir. 1990).   "Allegations of negligence or innocent mistake are

insufficient."   Franks v. Delaware, 438 U.S. at 171.

In Beard v. City of Northglenn, 24 F.3d 110 (10th Cir. 1994), Justice White, sitting by

designation, stated:

> [W]hile in hindsight it is beyond cavil that [the investigating officer] made a mistake
> in his representations to [the expert witness], and while the mistake may have had an
> impact in the outcome of [the expert witness'] analysis and the warrant application
> hearing,  neither of these points bears much relevance to our inquiry.  Under the
> Fourth Amendment our inquiry is focused neither on the existence nor the
> consequence of [the investigating officer's] error but on the intention behind it.

24 F.3d at 116.

### 2.        **Probable Cause and Determinations of Other Judicial Bodies.**

A reviewing court should accord "substantial deference" to a magistrate's "determination

of probable cause to issue an arrest warrant."   St. John v. Justmann, 771 F.2d 445, 447-48 (10th Cir.

1985)(citing Spinelli v. United States, 393 U.S. 410, 419 (1968)).   See J.B. v. Wash. Cnty., 127 F.3d

919, 930 (10th Cir. 1997)(noting that an order "tantamount to an arrest warrant" is owed the "same

deference . . . we would owe to a magistrate's finding of probable cause in issuing a warrant").   "The

court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that

probable cause existed."   Illinois v. Gates, 462 U.S. at 236, 238-39.   This deference is appropriate

to further the Fourth Amendment's strong preference for warrants.   See Massachusetts v. Upton, 466

U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of

the constitutionality of a search warrant should begin with the rule that the informed and deliberate

determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried

action of office[r]s . . . .").

The deference accorded a magistrate judge's probable cause determination, however, is not

boundless.  See United States v. Leon, 468 U.S. 897, 914 (1984).  The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F.App'x 815, 822 (10th Cir. 2006)(unpublished)(citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 230-31 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 230-31 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity at summary judgment, the responsibility shifts

to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.    Factual Disputes in the Qualified-Immunity Analysis.

In determining whether the plaintiff has met his or her burden of establishing a constitutional violation that was clearly established, the court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v. Goodman, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts and the plaintiff alleges them").  In Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F.Supp.2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury."  Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the

> plaintiff's testimony was discredited by a videotape that completely contradicted his
> version of the events.  550 U.S. at 379.  Here, there is no videotape or similar
> evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only
> other witnesses' testimony to oppose his version of the facts, and our judicial system
> leaves credibility determinations to the jury.  And given the undisputed fact of injury,
> Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not
> its admissibility. . . . Mr. Rhoads alleges that his injuries resulted from a beating
> rendered without resistence or provocation.  If believed by the jury, the events he
> describes are sufficient to support a claim of violation of clearly established law
> under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F.App'x 289, 291-92 (10th Cir. 2009)(unpublished)(internal quotation marks

omitted).  See Lymon v. Aramark Corp., 728 F.Supp.2d at 1249-50 (quoting Rhoads v. Miller, 352

F.App'x at 291-92).  In a concurring opinion in Thomson v. Salt Lake County, the Honorable

Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus

first on the legal question of qualified immunity and "determine whether plaintiff's factual

allegations are sufficiently grounded in the record such that they may permissibly comprise the

universe of facts that will serve as the foundation for answering the legal question before the court"

before inquiring into whether there are genuine issues of material fact for resolution by the jury.

584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770

(11th Cir. 1988)(Johnson, J., dissenting)(observing that, even if factual disputes exist, "these

disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity

of the plaintiffs' facts.")).

## 2.   **Clearly Established Rights.**

In evaluating whether the right was clearly established, the court considers whether the right

was sufficiently clear that a reasonable government employee in the defendant's shoes would

understand that what he did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473

F.3d 1323, 1327 (10th Cir. 2007).  A clearly established right is generally defined as a right so

thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court of the United States has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 194).

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 235-36.  The Supreme Court also noted in Pearson v. Callahan that, while no longer mandatory, the protocol outlined in Saucier v. Katz will often be beneficial.  See 555 U.S. at 235-36.  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon

v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

### RELEVANT LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. See 28 U.S.C. §§ 1331-32.

### 1.     Supplemental Jurisdiction.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552. The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction. Federal courts may exercise pendent jurisdiction over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action even after the introduction of third parties whose insertion into the litigation is not supported by any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it. See Owen Equip. & Erection Co. v. Kroger, 437 U.S.

365, 375 n.18 (1978).

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See 16 Moore's Federal Practice, § 106.04[5] (Matthew Bender 3d ed.).  In response to the Committee's findings regarding "pendent" and "ancillary" jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence."  Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

### 2.       District Court Discretion.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction, not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and

fairness to litigants" when deciding whether to exercise supplemental jurisdiction. 383 U.S. at 726. Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("Section 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist. Court, 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be

exercised in the absence of any of the four factors of section 1367(c).");  Bonadeo v. Lujan, No. 08-0812, 2009 WL 1324119, at *8 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").  At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion.  See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").  This Court has stated that, "[i]n circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction."  Krumm v. Holder, No. 08-1056, 2009 WL 1563381, at *14 (D.N.M. May 27, 2009)(Browning, J.).[34]

## ANALYSIS

The Court concludes that the Defendants timely asserted qualified immunity.  Because Casaus had probable cause to arrest Garcia, the Court finds that she is entitled to summary judgment and qualified immunity on Count I of the Complaint, Unreasonable Seizure (Arrest).  The Court also finds that Casaus is entitled to summary judgment and qualified immunity on Count II of the Complaint, Prosecution without Probable Cause and Selective Prosecution, because Casaus had probable cause and did not withhold information from the prosecutor or make materially false statements before the grand jury.  Additionally, the Court concludes that the City of Rio Rancho is

---

[34]The Court's decision in Krumm v. Holder does not directly discuss how 28 U.S.C. § 1367(c) affects the district court's discretion, but it cites to Bonadeo v. Lujan, which states that 28 U.S.C. § 1367(c) modified district courts' supplemental jurisdiction discretion.  See 2009 WL 1563381, at *14 (citing Bonadeo v. Lujan, 2009 WL 1324119, at *8).

entitled to summary judgment on the 42 U.S.C. § 1983 municipal liability claims, because there is no underlying constitutional violation.  Even if there was an underlying constitutional violation, the City of Rio Rancho would be entitled to summary judgment, because Garcia has introduced no evidence of a pattern of constitutional violations or that the likelihood of a constitutional violation was patently obvious.  Because this Memorandum Opinion and Order and the Court's previous Order of Dismissal of Count III dispose of all the federal issues in this case, the Court will remand the remaining state claims and the case to the Thirteenth Judicial District, Sandoval County, State of New Mexico.

## I.       CASAUS' ASSERTION OF QUALIFIED IMMUNITY IS TIMELY.

Garcia argues "the defense [of qualified immunity] has been asserted in Motion form, for the first time, at least ten months after initiation of Plaintiff's civil rights lawsuit on December 1, 2010" and the Court "should deny a belated granting of qualified immunity."  Response at 18.  On January 12, 2010, the Defendants put Garcia on notice that they would defend on the basis of qualified immunity.  See Amended Answer at 8 ("Seventh Affirmative Defense.  Defendant Casaus is entitled to the defense of qualified immunity as to federal claims asserted against her, or the defense of qualified immunity/good faith as to the state tort claims asserted against her . . . .").  Additionally, qualified immunity may be raised  at any point before trial at which it is appropriate.  See Gaston v. Ploeger, 297 F.App'x 738, 745 (10th Cir. 2008)(unpublished); Langley v. Adams Cnty., Colo., 987 F.2d 1473, 1481 n.3 (10th Cir. 1993)("[Q]ualified immunity can be raised at any time and a district court may enter summary judgment on that ground 'at any point before trial' at which it is appropriate.").  The Defendants invocation of a qualified immunity defense is thus timely and the Court will consider it.

## II.   CASAUS IS ENTITLED TO QUALIFIED IMMUNITY AND SUMMARY JUDGMENT ON GARCIA'S FOURTH-AMENDMENT UNREASONABLE ARREST CLAIM.

The Defendants argue that Casaus had probable cause to arrest Garcia on February 12, 2010 based on: (i) K.J.'s statements that he was punched, he was choked, his pants were pulled down, and Garcia laid down next to him in bed; (ii) the first two statements were made to Katz, a friend of K.J.'s mother, who discovered K.J. ten feet from Garcia; (iii) K.J.'s bed and Garcia's pants were both wet; (iv) Garcia would not explain K.J.'s condition or Garcia's wet pants when Katz inquired, and then Garcia locked himself in a bathroom; (v) Garcia stated that he had no recollection of being close to K.J. or being confronted about his condition; and (vi) K.J.'s statements that he had been hit, choked, and urinated on during the safe-house interview.  See MSJ at 20-22.  The Defendants also assert that Casaus is entitled to qualified immunity, "[b]ecause Detective Casaus had a reasonable basis to believe Plaintiff Garcia had committed crimes and no basis for believing she violated any of Plaintiff's Fourth Amendment rights."  MSJ at 33.  Garcia also argues that Casaus did not have probable cause, because: (i) the evidence on which she relied was not credible given the inconsistencies in K.J.'s statements, and Katz' and Odom's bias; (ii) she failed to consider any exculpatory evidence; (iii) her investigation was incomplete and unreasonable; (iv) she did not collect or preserve any physical evidence; and (v) she made false or misleading statements in her arrest warrant affidavit, and while testifying before the grand jury.  See Response at 18-21.

When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d at 1128.  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the

alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d at 1107.  Furthermore, a reviewing

court should accord "substantial deference" to a magistrate's "determination of probable cause to

issue an arrest warrant."  St. John v. Justmann, 771 F.2d at 447-48 (citations omitted). See J.B. v.

Wash. Cnty., 127 F.3d at 930.  Although a district court

> may determine whether probable cause existed at the time of the arrest by taking into
> account factors such as whether the officer reasonably interviewed witnesses readily
> available at the scene, whether he investigated basic evidence or whether he inquired
> if a crime had been committed at all before invoking the power of . . . arrest and
> detention, none of these factors are dispositive or indeed necessary to the inquiry.

Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002).  Instead, the "primary concern

is whether a reasonable officer would have believed that probable cause existed to arrest the

defendant based on the 'information possessed by the [arresting] offic[er].'"  Olsen v. Layton Hills

Mall, 312 F.3d at 1312 (citation omitted)(alteration original).  Thus, to defeat the motion for

summary judgment on the Fourth-Amendment claim related to his arrest, Garcia must establish that

Casaus lacked probable cause to arrest him and that this violation was clearly established.

### A.    CASAUS HAD PROBABLE CAUSE TO ARREST GARCIA.

The validity of an arrest "does not depend on whether the suspect actually committed the

crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is

irrelevant to the validity of the arrest."  Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).  "Probable

cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and

of which they have reasonably trustworthy information, are sufficient in themselves to warrant a

man of reasonable caution in the belief that an offense has been or is being committed.'"  United

States v. Valenzuela, 365 F.3d at 896-97.  Because Garcia challenged each piece of evidence upon

which Casaus relied, the Court will address each challenged piece of evidence in turn and then the

totality of the evidence.

### 1.    Casaus Was Entitled to Rely on K.J.'s Statements.

Casaus relied primarily on K.J.'s statements, on the night of incident and at the safe-house interview, that Garcia, whom he referred to as "the kid's dad" or "that guy," choked, hit, and urinated on him to establish probable cause.  MSJ at 2.  Phelps reported that he made contact with K.J. and that K.J. told him that "he was hit in the head and elbowed by Mr. Mitchell."  Phelps Report at 1.  Lepori reported that he overheard K.J. tell Phelps that "the man had chocked [sic] and had his hands down his pants."  Lepori Report at 7.  Furthermore during the safe-house interview, K.J. explained that "the kids' dad want to punch me and choke me."  Safe-House Tr. at 3:20-21, 10:5-7. K.J. also explained during the safe-house interview that "the kids' dad" pulled his pants down to show K.J. his "butt and his pee pee," and that "the kids' dad" urinated on him.  Safe-House Tr. at 11:14-23, 12:13-19.  K.J. stated that the kids' dad peed on his mouth, pulled off K.J.'s pants, and later demonstrated how he was peed on using anatomically correct dolls.  See Safe-House Tr. at 13:3-6, 14:19-20, 25:3-9.

Garcia argues that there are a number of examples of information indicating a reason to doubt the accuracy of K.J.'s statements.  See Response at 28.[35]  Garcia asserts that K.J. alleged: (i) that he beat up and that the police shot "that guy"; (ii) that the kids' dad "peed on" Katz and Odom; (iii) that he is surrounded by imaginary friends, including Andy and Tom; (iv) that Christian or

---

[35]Garcia also challenges the techniques used during the forensic interview as "sub-standard, archaic, and not employing up-to-date, prevailing scientific methodology."  Response at 31.  Garcia does not argue that a reasonable police officer should have known that these techniques were unreliable, or that Casaus knew that these techniques were unreliable, and primarily uses his experts' testimony on the conduct of the safe-house interviewer as a means of establishing municipal liability.  See Response at 23-24.  The Court therefore will not consider these alleged defects in determining whether Casaus was entitled to rely on K.J.'s statements.

Kristen lives at the safe-house; and (v) that the kids' dad tried to steal his scooter.  See Response ¶¶ 1-5, 8, 13, at 28-30, 33.  Garcia further asserted that K.J.'s accusations escalated as the safe-house interview progressed.  See Response ¶ 10, at 32-33.  Although some of K.J.'s statements are fantastical or inconsistent with the evidence, Garcia does not always correctly interpret what K.J. said during the interview.  For example, Garcia expresses his concern about "Andy."  Response ¶ 3, at 28-29.  After viewing the DVD of the safe-house interview, however, the Court determined that K.J. said: "Christian was fooling around and he went in Jennifer's room."  Safe-House DVD at 8:26-8:33 (emphasis added).  When asked who Andy is, K.J. is initially confused and says "I don't know who's Andy," but then apparently remembers an "Andy" from another context.  Safe-House DVD at 8:55-9:08.  Additionally, Garcia expresses concern about "Tom," but when K.J. is asked "[d]id you say 'Tom'? Or did I get that wrong," K.J. explains that the interviewer "did that wrong."  Safe-House Tr. at 6:21-23.  K.J. also corrects himself when he states that the police shot "that guy" and says "oh, no -- they put him in jail."  Safe-House Tr. at 15-12-14.  Garcia is correct that K.J. stated that he was there when the police arrived, that he tried to steal K.J.'s scooter, and that he peed on Katz and Odom -- statements which the record does not support.  See Response at 28, 33.

While some of K.J.'s statements during the safe-house interview are certainly inaccurate and inconsistent, the Tenth Circuit has held that courts and police officers do not have to discount the statements of very young children based solely on their age and apparent inconsistencies.  See Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985)("To discount such testimony from the outset would only serve to discourage children and parents from reporting molestation incidents and to unjustly insulate the perpetrator of such crimes from prosecution.").  Accord Marx v. Gumbiner, 905 F.2d 1503, 1506 (11th Cir. 1990)("But we believe that Kristina's statements could

not be disregarded and that her statements supported defendants' conclusion that probable cause existed.").  The Tenth Circuit requires corroboration, see Cortez v. McCauley, 478 F.3d 1108, 1119 (10th Cir. 2007)(en banc), which the Court will discuss in a subsequent section examining the totality of the circumstances.  The substance of K.J.'s statements between January 27, 2010, when he spoke with Phelps, and the February 12, 2010 safe-house interview, did not change much -- K.J. consistently stated that he had been hit and choked.  It was not "patently unreasonable" for Casaus to rely on K.J.'s statements.  Response at 28.

## 2.  Casaus Was Entitled to Rely on Katz' and Odom's Statements.

Garcia asserts that Katz and Odom were not impartial witnesses, because Katz had a former sexual relationship with Garcia and because Odom sexually assaulted Garcia on the night of the incident.  See Response at 33.  Furthermore, Garcia argues, Odom and Katz were heavily intoxicated during the night of the event, and Casaus did not take their level of intoxication into account when assessing their reliability.  See Response at 33.  Garcia cites United States v. 1948 S. Martin Luther King Drive, 270 F.3d 1102 (7th Cir. 2001), which held that "[h]earsay and other circumstantial evidence are admissible in determining probable cause, as long as there is 'strong indicia of reliability.'"  270 F.3d at 1112-13.  Garcia appears to challenge both Katz' and Odom's statements as they relate to the reporting of K.J.'s statements and Katz' statements regarding Garcia's conduct that night.  The Defendants argue that it is not for the police to rule on the veracity of a victim's assertion and that Casaus had no reason to know of any bias.  See Reply at 8.  The Defendants cite Davis v. Tavares, No. 09-4066, 2011 WL 53440 (N.D. Ill. Jan. 11, 2011), for the proposition that police may arrest, and let prosecutors and courts determine who is telling the truth.  See 2011 WL 53440, at *4.

All of the adults involved in this incident admit to drinking.  See Katz Decl. ¶¶ 5-6, at 1-2 (admitting that she was drinking); Odom Decl. ¶¶ 6-7, at 1-2 (admitting that she was drinking); Response at 4 (citing Garcia Depo. at 87:21-25)("[H]e was intoxicated after doing several shots with Odom and Katz.").  This reality puts the police in a difficult position, because to some extent, they must rely on the statements of some intoxicated person, either in believing or disbelieving the accusations.  Although Garcia alleges that the two neighbors were present in the apartment after Katz and Odom began attacking him, he does not allege that those neighbors ever saw or spoke to K.J.  See Response at 5.  Several courts have addressed the effect of drunk witnesses on probable cause.  In Lallemand v. University of Rhode Island, 9 F.3d 214 (1st Cir. 1993), the United States Court of Appeals for the First Circuit held that full disclosure to the state court judge that the victim was drunk "would not in any way have undercut probable cause," because the victim was positive, and there was "no suggestion that she was incoherent or vague when she gave her statements to police or made the photographic identification."  9 F.3d at 216.  Similarly, the United States Court of Appeals for the Sixth Circuit, in Hale v. Kart, 396 F.3d 721 (6th Cir. 2005), held that, "although it is possible that an angry and intoxicated person may be less reliable than a detached uninterested observer who is sober, it is equally possible that those same factors can make a witness more inclined to be truthful than they otherwise might.  Those factors, if included would not have so undermined the credibility of the witness or the affidavit as to cause the judge to deny the warrant for lack of probable cause."  396 F.3d at 730.  In a more recent case, the United States District Court for the District of Oregon held that, "including both the fact that Caldwell said she was drunk, along with the information that Officer Foxworth did not comment on her lack of sobriety, does not detract from the finding of probable cause."  United States v. Washington, No. 07-112, 2008 WL 3862075,

at *5 (D. Or. Aug. 18, 2008).

On the issue of bias or improper motive, the United States District Court for the District of Colorado addressed the plaintiffs' argument that a police officer should not have believed the complaining witness or conducted a more thorough investigation of the other witnesses he interviewed.  See Chalek v. McGee, No. 04-00299, 2006 WL 2331083, at *5 (D. Colo. Aug. 10, 2006).  That district court noted that the plaintiffs had not presented evidence suggesting that, at the time of the arrest and search, the officer had evidence that would destroy the presumption of reliability attributed to citizen complainants and that the law does not require that a police officer exhaust all possible instances of bias in a complaining witness.  See Chalek v. McGee, 2006 WL 2331083, at *5.  Ultimately, the District of Colorado held that a reasonable officer could conclude that probable cause existed.   See Chalek v. McGee, 2006 WL 2331083, at *5.  In Rose v. City of Wenatchee, No. 03-0460, 2005 WL 1898565 (E.D. Wash. Aug. 9, 2005), the plaintiff alleged that the prosecutor was aware that the initial source of child abuse allegations was the minor's mother, who was involved in a custody dispute with the father, when he filed an affidavit in support of probable cause.  See 2005 WL 1898565, at *1, *6.  The United States District Court for the Eastern District of Washington held that, "[i]n the absence of substantial reason to conclude that [the mother] was deliberately lying or covering the facts, it was not a reckless act to rely upon the statement in support of the criminal charges against the plaintiff." Rose v. City of Wenatchee, 2005 WL 1898565, at *7.  The Eastern District of Washington further commented:

> The fact that [the mother] was involved in a custody dispute involving the children is an immaterial fact to the finding of probable cause and furthermore, does not disqualify [the mother] as a witness whose testimony and demeanor, as well as bias, would ultimately be placed before the trier of fact who would hear all of the evidence and render a verdict.

Rose v. City of Wenatchee, 2005 WL 1898565, at *7.  In Darby v. City of Dixon, No. 01-50155,

2003 WL 22159474 (N.D. Ill. Sept. 18, 2003), the plaintiff argued that because of inconsistencies

and the bias of the victim, the police could not reasonably rely on those statements as the basis for

probable cause.  See 2003 WL 22159474, at *1.  The United States District Court for the Northern

District for Illinois held that, "when probable cause has been gained from a reasonably credible

victim or witness, there is no constitutional duty to investigate further."  Darby v. City of Dixon,

2003 WL 22159474, at *1.  In another case from the Northern District of Illinois, the plaintiff argued

that the victim had a grudge against the plaintiff, because the plaintiff was dating the victim's ex-

girlfriend.  See Davis v. Tavares, 2011 WL 53440, at *4.  That court noted that the case fell within

the "general rule that police have probable cause for arrest if a reasonably credible victim informs

police that someone has committed a crime."  Davis v. Tavares, 2011 WL 53440, at *4.  The

Northern District of Illinois held that the police "had no reason to question [the victim's] credibility"

and that the circumstances of that case were not such that the police were obliged to conduct further

investigation.  Davis v. Tavares, 2011 WL 53440, at *4.  In the case Garcia cites, United States v.

1948 S. Martin Luther King Drive, the United States Court of Appeals for the Seventh Circuit held

that the witnesses, convicted felons and drug dealers, were not so unreliable that they could not be

used to support probable cause.  See 270 F.3d at 1113.

        All of the cases referenced above, with the exception of United States v. Washington, which

was decided following a suppression hearing, were decided at the summary judgment stage.  The

Court notes that it, and these other federal courts, have been comfortable making these decisions at

the summary judgment stage, because the Court is not finding as a matter of law that these

statements were credible; instead, the Court finds that there is no evidence on the record that these

witnesses or statements were so incredible that the police could not use them to establish probable cause. The law does not require that police officers determine that everything a witness reports is true before making an arrest; it only requires that a witness be reasonably credible.   The United States Court of Appeals for the Seventh Circuit in Spiegel v. Cortese, 196 F.3d 717, 724 (7th Cir. 2000), a case Garcia cites, when confronted with these same questions, held:

> We do not agree with Spiegel that these purported facts would have caused a reasonable officer to take further investigative steps.  While the lengthy and ongoing dispute culminating in the altercation and the other charges Cherny had filed might tend to establish Cherny's bias, these facts do no render Cherny's report incredible as a matter of law. . . .  More importantly, no clearly established precedent required Cortese to resolve these inconsistencies before arresting Spiegel.

196 F.3d at 724 (emphasis added).  Similarly, the Court does not believe Garcia's speculation that Katz and Odom were so biased that they lied to the police is sufficient to block summary judgment or create a genuine issue of material fact, precluding summary judgment.  The Court concludes that Casaus was entitled to rely on Katz' and Odom's statements with respect to their own observations and with respect to what K.J. told them.  Although there is evidence that Katz and Odom were drinking, Garcia has presented the Court with no evidence that they were so incapacitated as to be unreliable.  Only Garcia appears to have become so intoxicated that his memory was compromised, see Response at 4 (stating that Garcia was unsure how his pants became wet), and that he passed out, see Response at 4 (stating that because he was intoxicated Garcia lay down on the floor and went to sleep next to his daughter).  Garcia has pointed to no evidence that Katz' and Odom's statements to the police were vague or incoherent, or that Katz and Odom exhibited those behaviors leading up to the incident.  See Lallemand v. Univ. of R.I., 9 F.3d at 216.  With respect to the allegations of bias and improper motive, the law does not require that a police officer exhaust all possible instances of bias in a complaining witness, see Chalek v. McGee, 2006 WL 2331083, at *5, and the police "had

no reason to question [Katz or Odom's] credibility," because when Garcia spoke to Thacker, he did not mention Katz' or Odom's motive to lie, Davis v. Tavares, 2011 WL 53440, at *4.  Garcia also did not complain about Katz' or Odom's bias during his interrogation.  Furthermore, there was significant information corroborating Katz' and Odom's statements: (i) Katz and Odom confirmed each others statements; (ii) K.J. confirmed their statements when he spoke to Phelps; (iii) the bed was wet; and (iv) Garcia's pants were wet.  See Katz Statement at 1; Odom Statement at 1; Phelps Report at 1; Thacker Report at 1; Photo.s 1-5.  The Court therefore concludes that Casaus was entitled to rely on Katz' and Odom's statements reflecting both what they knew and what K.J. told them, because, even considering their state of intoxication and possible bias, there is nothing in the record to suggest that they were so incredible, as a matter of law, that Casaus could not use their statements as the basis for probable cause, or that the Court cannot, as a matter of law use them to determine probable cause.

### 3.      Casaus Was Entitled to Rely, and Reasonably Relied, On the Officer's Reports.

Garcia argues that, "in making a ruling on probable cause, the Court should not . . . consider the statements made by other officers in their police reports, or eyewitness statements . . ., since Defendant Casaus states that she did not rely on these in making her probable cause determination."  Response at 17.  The Defendants contend that Casaus "relied on information and evidence from the whole case."  Reply at 3.

Casaus in her deposition stated that she relied on "information and evidence collected from the whole case"; specifically, she agreed that she relied on statements, police reports, and photographs.  Casaus Depo. at 48:13-49:16.  Casaus' agreement that the only "evidence" which she had when she sought an arrest warrant was the safe-house interview, does not establish that she did

not rely on those other reports and statements, but only that she did not consider them "evidence." Casaus Depo. at 36:5-11. Furthermore, probable cause is an objective standard and the subjective belief of an individual officer is not dispositive. See Koch v. City of Del City, No. 10-6105, 2011 WL 5176164, at *6 (10th Cir. Nov. 2, 2011). Casaus was also entitled to rely on the officers' statements and reports. Here, within a day or two of becoming part of the investigation, Casaus had all of the information in the file to date, including other officers' reports concerning their interviews of the witnesses. See Casaus Decl. ¶ 6, at 2. As Garcia concedes, hearsay evidence may form the basis for a probable-cause determination. See United States v. Mathis, 357 F.3d 1200, 1204 (10th Cir. 2004)(citing Jones v. United States, 362 U.S. 257, 269 (1960)). Moreover, the Tenth Circuit has recognized that multiple layers of hearsay may support a finding of probable cause for a search warrant. See United States v. $149,442.43 in U.S. Currency, 965 F.2d 868, 874 n.3 (10th Cir. 1992)("Although this statement is hearsay, and perhaps multiple hearsay, hearsay may be used to establish probable cause."). Furthermore, police officers frequently rely on the investigative work of other officers to establish probable cause or to justify an arrest. The Tenth Circuit has recognized the utility and validity of this practice in the collective-knowledge doctrine. Under the collective-knowledge doctrine -- also called the "fellow officer rule" -- the knowledge of one officer supporting a search or seizure may be imputed to other law enforcement officers acting in conjunction with the knowledgeable officer. See United States v. Hensley, 469 U.S. 221, 232-33 (1985); United States v. Wilkinson, 633 F.3d 938, 941 (10th Cir. 2008). The "horizontal" branch of the collective-knowledge doctrine closely resembles the situation before the Court, because one officer  will communicate information necessary to establish probable cause to another who makes the arrest. United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008). The horizontal collective knowledge

doctrine "subsumes situations where a number of individual law enforcement officers have pieces of the probable cause puzzle . . . and the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge."  United States v. Chavez, 534 F.3d at 1345.  Any argument suggesting that Casaus is not entitled to rely on the written reports of her fellow officers fails to recognize that the Tenth Circuit has acknowledged the validity of an officer relying on pooled law enforcement knowledge to reach probable cause.   Thus, Casaus was entitled to rely on the statements made to the officers as well as the double hearsay statements contained in the reports concerning what K.J. told Katz and Odom before the officers arrived.

**4.      The Totality of the Circumstances Support a Finding of Probable Cause.**

"Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime."  Cortez v. McCauley, 478 F.3d 1108, 1116 (10th Cir. 2007).  In this case, Casaus had the following information available to her before Garcia's arrest: (i) K.J.'s statements to his mother, that "he, 'Mitch' choked [K.J.] and wanted to fight," Odom Statement at 1; (ii) K.J.'s statements to Katz that "that guy" was the reason the bed was wet, that guy laid in bed with him, and that guy pulled his pants down, Katz Statement at 1; (iii) Katz' statement that she overheard K.J. tell Odom that "Mitch" choked him, Katz Statement at 1; (iv) Katz' statements that she found K.J. crying, with Garcia ten feet away, and that when asked why his pants were wet Garcia responded "kids," Katz Statement at 1; (v) K.J.'s statements to Phelps, as contained in his police report, that he was hit and elbowed by "Mr. Mitchell," Phelps Report at 1; (vi) Lepori's Report stating that he overheard K.J. tell Phelps that the man had choked him and had his hands down his pants, see Lepori Report at 7; (vii) the wet bedding from the room where

K.J. was sleeping, see Phelps Report at 1; (viii) Thacker's report that Garcia reeked of alcohol and admitted to consuming a large amount of alcohol, see Thacker Report at 1; (ix) Thacker's photographs of a wet spot on Garcia's leg, see Photo.s 1-5; and (x) K.J.'s statements during the safe-house interview that the kids' dad hit, choked, pulled K.J.'s pants down, pulled his own pants down to show K.J. his "butt and pee pee," and that he urinated on K.J., Safe-House Tr. at 1:20, 3:20-21, 11:14-25, 12:13-19, 14:19-20.

When a probable cause determination involves the inconsistent statements of a young child, the Tenth Circuit does not discount those statements, but requires that there be corroboration.  See Cortez v. McCauley, 478 F.3d at 1119.[36]   In that case, the police responded to a telephone call from a hospital nurse reporting that a two-year old girl's mother stated that the girl reported that her babysitter's boyfriend had "hurt her pee pee" with "an immediate arrest of the babysitter's husband." Cortez v. McCauley, 478 F.3d at 1116.  The defendants in that case did not: (i) interview the girl, her mother, the nurse, or the doctor; (ii) inspect the girl's clothing for signs of sexual assault; or (iii) wait for a preliminary report from the doctor.  See Cortez v. McCauley, 478 F.3d at 1117.  In Cortez v. McCauley the Tenth Circuit seemed particularly concerned with the language abilities of a two-year old, stating that she was "barely-verbal" and repeatedly referencing that the accusation was from a two-year old.  See 478 F.3d at 1116.  Judge Gorsuch opinion, concurring in part and

---

[36]Cortez v. McCauley was decided on rehearing en banc.  Six judges concurred in part and dissented in part, with Judges Hartz, O'Brien, Tymkovich, Holmes, and McConnell joining Judge Gorsuch's opinion.  See 478 F.3d at 1133 (Hartz, J., concurring in part and dissenting in part); 478 F.3d at 1136 (McConnell, J., concurring in part and dissenting in part); 478 F.3d at 1137 (Gorsuch, J., concurring in part and dissenting in part).  Judge Gorsuch concurred in the finding of an absence of probable cause in violation of the Fourth Amendment, but did not agree with the majority's reasoning, and dissented from the denial of qualified immunity.  See 478 F.3d at 1141 (Gorsuch, J., concurring in part and dissenting in part).

dissenting in part, also focused on the age of the child.  See Cortez v. McCauley, 478 F.3d at 1139

(Gorsuch, J., concurring in part and dissenting in part)("[T]he child was younger, indeed barely past

the age of language acquisition[] and the statement that Mr. Cortez 'hurt the child's pee pee' was

ambiguous . . . .").  Furthermore, Cortez v. McCauley involved a warrantless arrest.  See 478 F.3d

at 1116.

       This case presents a substantially different picture of a police investigation than Cortez v.

McCauley.  In this case, the police, although not Casaus personally, spoke to Odom, Katz, K.J., and

Garcia, and there is no allegation that anyone else witnessed K.J. and Garcia's interactions, or spoke

to K.J.  Additionally, Casaus arranged a safe-house interview to ensure that the most accurate

accounting of what occurred could be obtained from K.J.  Unlike Cortez v. McCauley, where the

officer's relied only on a double-hearsay statement conveyed via telephone, see 478 F.3d at 1122,

the police in this case had spoken to every adult who appears to have had any interaction with K.J.

during the time K.J. was at the apartment.  Moreover, the police spoke to K.J. twice, once in an

abbreviated format on the night of the incident and once in an extended safe-house interview, and,

for the most part, his story remained consistent.  This case more closely resembles Easton v. City

of Boulder, where the Tenth Circuit found probable cause, than Cortez v. McCauley.  K.J. was the

same age as the oldest child in Easton v. City of Boulder, five-years old, see 776 F.2d at 1449, and

more verbal than the two-year old involved in Cortez v. McCauley, see 478 F.3d at 1116.  Here, K.J.

directly communicated the details of his assault to a police officer or representative on two

occasions, like the children in Easton v. City of Boulder, and unlike Cortez v. McCauley.  See

Cortez v. McCauley,  478 F.3d at 1122 ("In Easton, the police twice interviewed the children and

possessed ample corroborating evidence.  In this case, the child was not interviewed by law

enforcement once, let alone twice, nor was anyone else prior to the arrest.").  Furthermore, there was

physical evidence to corroborate K.J.'s story, in the form of the wet bedding and Garcia's wet pants.

Garcia also cites O'Connell v. City of Santa Fe, No. 03-979, Memorandum Opinion and

Order, filed March 9, 2005 (Doc. 40)(Black, J.),[37] where Judge Black[38] for the United States District

Court for the District of New Mexico held that:

> Although it is a close call, the Court finds that the inconsistent information from the
> alleged victim as to whether any crime had occurred, together with the lack of
> physical evidence of such a crime, lessens the impact of Mother's hearsay account
> of what happened to Boy to the extent that the probable cause created that account
> was vitiated.   Mother's account  certainly provided reasonable suspicion to
> investigate further, even given the evidence recited above indicted doubt as to
> whether any sexual contact had occurred between Plaintiff and Boy.  In sum,
> however, the hearsay account of what Boy had told Mother was sufficiently
> contradicted by Boy's repeated failures to repeat the allegation to anyone else, except
> to report what Dr. Lieberman had done to him, to "warrant a person of reasonable
> caution" to have doubts whether "the facts and circumstances from a reasonably
> trustworthy source indicated that "a crime has been . . . committed by the person to
> be arrested." United States v. Pearson, 203 F.3d 1243, 1268 (10th Cir. 2000)(stating
> probable cause standard).

O'Connell v. City Santa Fe, Memorandum Opinion and Order at 25.  That case is, again,

significantly different than the case before the Court.  As Judge Black noted, the child's accusation

was only related through his mother -- a hearsay statement like that in Cortez v. McCauley -- and

was never repeated.  See O'Connell v. City Santa Fe, Memorandum Opinion and Order at 25.  Here,

however, K.J. stated multiple times -- including to police, Odom, Katz, and a trained safe-house

---

[37]Although the Court could not locate this opinion on Westlaw or LexisNexis, the Court
notes that the Memorandum Opinion and Order is available on CM/ECF and online at
http://scholar.google.com/scholar_case?case=1450235420758876638l&hl=en&as_sdt=2&as_vi
s=1&oi=scholarr (last visited November 30, 2011).

[38]Judge Black became the Chief Judge for the United States District Court for the District
of New Mexico in 2010.

interviewer -- that he had been hit, punched, and his pants were pulled down.  While not perfectly

consistent, K.J. always conveyed that he had been attacked by "the kids' dad."

Additionally, before arresting Garcia, the Defendants obtained a determination that probable

cause existed and an arrest warrant from a state court judge.  See Arrest Warrant Aff. at 1-2; Arrest

Warrant at 1.  That probable cause determination is entitled to great deference in this Court.  See St.

John v. Justmann, 771 F.2d at 447-48.  "[A] reviewing court's only duty is to ensure that the [judge]

had a substantial basis for concluding that probable cause existed."  United States v. Stout, No. 10-

5153, 2011 WL 4792877, at *6 (10th Cir. Oct. 11, 2011)(citing United States v. Mathis, 357 F.3d

at 1205).  Accord Poolaw v. Marcantel, 565 F.3d 721, 729 (10th Cir. 2009)("We review the district

court's ruling on the sufficiency of the warrant de novo, but we pay great deference to the probable

cause determination made by the judge who issued the warrant.");[39] United States v. Christy, 785

F.Supp.2d 1004, 1051 (D.N.M. 2011)(Browning, J.)(discussing the great deference due a

magistrate's finding of probable cause and that the Court reviews only whether there was a

substantial basis for concluding that probable cause existed given the facts set forth in the affidavit).

In the arrest warrant affidavit, Casaus explained that K.J. had reported to his mother that Garcia

punched and choked him.  See Casaus Warrant Aff. at 2.  Casaus also stated that K.J. began to

advise officers at the scene that "he pulled his pants down," but did not specify whether it was K.J.'s

pants that were pulled down or Garcia's.  Casaus Warrant Aff. at 2.  In her affidavit, Casaus reported

---

[39]In Poolaw v. Marcantel, the Tenth Circuit discussed the legal standard for analyzing a magistrate's decision to issue a search warrant in a civil case at the summary judgment stage.  See 565 F.3d at 728-29.  The Tenth Circuit relied on several criminal cases when setting forth this standard and cited Illinois v. Gates, 462 U.S. 213 (1983), for the proposition that the Tenth Circuit "will uphold a warrant if the issuing judge had a 'substantial basis for . . . conclud[ing] that a search would uncover evidence of wrongdoing.'"  Poolaw v. Marcantel, 565 F.3d at 728-29 (citing Illinois v. Gates, 462 U.S. at 236)(alterations original).

that she scheduled a safe-house interview, and described K.J. as a healthy and interactive five-year old boy.  <u>See</u> Casaus Warrant Aff. at 2.  Casaus advised that, during the safe-house interview, K.J. told Nochumson that "the kids' dad" choked and punched him.  Casaus Warrant Aff. at 2.  Casaus further reported that, when K.J. elaborated on what occurred, he stated that Garcia pulled his pants down to show him his "butt and pee pee," and that Garcia "peed (urinated on)" K.J.  Casaus Warrant Aff. at 2.  Casaus further described that K.J. related that Garcia held him by his shoulders and that he stated that the pee went into his mouth.  <u>See</u> Casaus Warrant Aff. at 2.  Casaus also described how K.J. demonstrated with anatomically correct dolls how Garcia peed into his mouth: K.J. placed the larger doll's penis, identified as Garcia, into the smaller doll's mouth, which was identified as K.J.  <u>See</u> Casaus Warrant Aff. at 2.  Chief Judge McDonald then issued an arrest warrant for criminal sexual penetration of a minor in violation of N.M.S.A. 1978, § 30-9-11.  <u>See</u> Arrest Warrant at 1.

Although the arrest warrant affidavit does not mention the available corroborating evidence, <u>i.e.</u>, it does not mention all of the information that Casaus knew, it provides enough information to demonstrate a sufficient basis for probable cause.  Additionally, Garcia does not allege that there were any material misstatements in the arrest warrant affidavit.  The affidavit explains that K.J. twice told police representatives that the kids' dad, Garcia, pulled down his pants and that during the safe-house interview K.J. explained that he was "peed" on.  The affidavit also sets forth that K.J. demonstrated, with the dolls, that when he was peed on, Garcia's penis went into his mouth.  <u>See</u> Arrest Warrant Aff. at 2.  The arrest warrant affidavit moves the evidence presented beyond the <u>Cortez v. McCauley</u> facts, because it demonstrates that: (i) K.J. is a verbal and healthy five-year old; (ii) officers spoke to K.J. more than once; and (iii) K.J. made accusations, in addition to his mother's

hearsay accusations.  The Court therefore finds that there was a substantial basis for Chief Judge McDonald to determine that probable cause existed.

The Court concludes that, the evidence available to Casaus at the time of arrest created a sufficient probability of criminal activity to justify arrest, all that is required under the United States Constitution.  See Wilder v. Turner, 490 F.3d 810, 813 (10th Cir. 2007)("Probable cause to arrest exists if, the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer in believing the defendant committed or is committing an offense. . . . Probable cause only requires a probability of criminal activity, not a prima facie showing of such activity.").  K.J.'s statements were reasonably consistent and there was corroborating evidence from the apartment as well as from Katz' and Odom's statements for Casaus to believe that there was a probability that something had occurred while K.J. was in the apartment with Garcia.  The Court gives due deference to the state court's determination that probable cause existed and determines that Chief Judge McDonald had a substantial basis for concluding that probable cause existed to arrest Garcia.

**B.     CASAUS DID NOT CONDUCT AN UNREASONABLE INVESTIGATION, AND THERE IS NO EVIDENCE THAT SHE WOULD HAVE DISCOVERED EXCULPATORY EVIDENCE HAD SHE INVESTIGATED FURTHER.**

Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation." Baptiste v. J.C. Penny Co., 147 F.3d 1252, 1259 (10th Cir. 1998).  Garcia cites Romero v. Fay, 45 F.3d 1472 (10th Cir. 1995), for the proposition that the Fourth Amendment requires "officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed."  45 F.3d at 1476.  Garcia argues that Casaus ignored easily accessible evidence and failed to conduct basic interviews with any of the material

witnesses.  See Response at 12-13.  The Defendants respond that the Constitution does not require police to conduct a perfect investigation, see Reply at 6, and cite Beard v. City of Northglenn, Colo., 24 F.3d 110 (10th Cir. 1994), as holding that the "failure to investigate a matter fully, to 'exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence' rarely suggests a knowing or reckless disregard for the truth."  24 F.3d at 116.

Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to  interview those witnesses again.  See Response at 12-13. Here, the responding police officers -- Lepori, Phelps, and Thacker -- interviewed every adult alleged to be involved in the incident and briefly spoke with K.J.  Garcia suggests that the Constitution also required that the police interview Katz' neighbors, Szczepanski and Dominguez, because those interviews may have revealed

> the nature of Odom and Katz' actions as they returned to the apartment at alternating 20 minute intervals, whether any of them doused the toddler bed with water as Plaintiff slept, whether Odom or Katz intended to falsely implicate Plaintiff or whether there was any other exculpatory evidence or leads available to her concerning the two of them as possible suspects.

Response at 13.  Garcia also states that, if Casaus had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him.  See Response at 13-14.  The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casaus was required to do more after the safe-house interview solidified the existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:

> Plaintiff contends that regardless of whether the statements by Duran and Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree.

45 F.3d at 1466. In Baptiste v. J.C. Penny Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest." 147 F.3d at 1257 n.8. In Koch v. City of Del City, the Tenth Circuit noted:

> Ms. Koch has not pointed to any "easily accessible" additional evidence that would have further informed Officer Beech as to Ms. Koch's knowledge of Ms. Lance's whereabouts, or that would have altered his understanding of the situation. Indeed, there is nothing to indicate that if Officer Beech had consulted the Order or called DHS or Adult Protective Services, he would have discovered anything materially different.

2011 WL 5176164, at *7. These cases establish that Casaus was not required to speak to Szczepanski and Dominguez, because they did not appear to be material witnesses. Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J. Garcia has also not presented any facts demonstrating that Szczepanski and Dominguez would have shed light on the motivations of Katz or Odom. Garcia only speculates that Casaus might have found something. An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment. In Romero v. Fay, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478. In Beard v. City of Northglenn, Colo.,

> Foster's statement does appear to intimate that if Neal had only investigated the source of the O'Meara and bank handwriting samples more thoroughly he would have discovered his error. And, perhaps this is true, but it does little to rescue

> appellant's case.  The failure to investigate a matter fully . . . <u>rarely</u> suggests a knowing or reckless disregard for the truth.

24 F.3d at 116 (emphasis added).  Furthermore, Garcia's other statements belie the fact that, if Casaus had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him.  When Thacker interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J.  <u>See</u> Thacker Report at 1.  Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him.  <u>See</u> Thacker Report at 1.  During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives.  The cases that Garcia cites establish only that the police may not ignore available material witnesses.  Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed.  Garcia presents no cases, and the Court could find none, suggesting that Casaus was required to repeat the steps other officers had already taken and re-interview all witnesses.  This repetition would undermine the collective-knowledge doctrine which allows the knowledge of one officer supporting a search or seizure to be imputed to other law enforcement officers acting in conjunction with the knowledgeable officer.  <u>See</u> <u>United States v. Hensley</u>, 469 U.S. at 232-33; <u>United States v. Wilkinson</u>, 633 F.3d at 941.  Moreover, these statements would not undermine the probable cause that already existed or have required further investigation.  <u>See</u> <u>Spalsbury v. Sisson</u>, 250 F.App'x 238, 246 (10th Cir. 2007)(unpublished)("A policeman, however, is under no obligation to give any credence to a suspect's story, and even a plausible explanation in no way requires the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.")(internal quotation marks

omitted)(citation omitted).  Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to "detect the presence of urine in or on a substance."  Zais Decl. ¶¶ 4-5, at 2.

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect.  See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).  The Court has already determined that Casaus had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview.  Casaus was not required to investigate further after that determination.

### C.    CASAUS IS ENTITLED TO QUALIFIED IMMUNITY ON COUNT I.

Even if probable cause did not exist, Casaus would be entitled to qualified immunity.  Garcia argues that the Defendants have provided no persuasive argument entitling Casaus to a "belated" grant of qualified immunity.  Response at 41.  The Defendants argue that Casaus is entitled to qualified immunity, because arguable probable cause existed, and to be entitled to qualified immunity officers are not required to have actual probable cause.  See MSJ at 32 (citing Harapet v. Vigil, 676 F.Supp.2d 1250, 1263 (D.N.M. 2009)(Browning, J.)).

"Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost."  Malley v. Briggs, 475 U.S. 335, 344-45 (1986).  Qualified immunity leaves "ample room for mistaken judgments," Anderson v. Creighton, 483 U.S. at 655 n.8, and protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. at 341.  Garcia does not allege that

Casaus knowingly violated the law.   Casaus need only have possessed a "reasonable belief that probable cause existed."  Coburn v. Nordeen, 72 F.App'x 744, 746 (10th Cir. 2003)(unpublished). To establish that a defendant is not entitled to qualified immunity, a plaintiff must "demonstrate that no reasonably competent official would have found indicia of probable cause supporting the complaint and arrest warrant."  Coburn v. Nordeen, 72 F.App'x at 747.  Here, Casaus reported and had evidence that K.J. stated that Garcia pulled down his pants, that Garcia showed K.J. his "butt and pee pee," and that Garcia "peed" on K.J.  Casaus also reported that K.J. demonstrated, with the dolls, that when he was peed on, Garcia's penis went into his mouth.  It was thus reasonable for Casaus to believe that she had presented evidence that Garcia had violated N.M.S.A. 1978, § 30-9-11, that being criminal sexual penetration of a minor.  Additionally, Garcia does not argue that Casaus was not entitled to rely on the affidavit.  Because the warrant is not so lacking in indicia of probable cause as to render Casaus' belief in its existence unreasonable, the Court will grant qualified immunity.

Furthermore, even if Casaus did not have probable cause, it was not clearly established that probable cause did not exist.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  Two cases from the Tenth Circuit concern factual scenarios relevant to the matter before the Court -- Easton v. City of Boulder, which found that there was probable cause, and Cortez v. McCauley, which found that there was not.  In Cortez v. McCauley, the Tenth Circuit found that:

> [T]he only information which arguably implicated Rick Cortex was a statement attributed to a barely-verbal two-year old child that her babysitters' "boyfriend" had "hurt her pee pee."  The statement was relayed by telephone to the officers, from a nurse, who heard it from the mother who ostensibly heard it from the two-year old.

> Rather than waiting to receive the results of the medical examination of the child, interview the child or her mother to better understand the circumstances, or seek to obtain a warrant, the officers responded to the statement with an immediate arrest of the babysitter's husband, Rick Cortez.

478 F.3d at 1117.  The Tenth Circuit also held: "That unsubstantiated double-hearsay originating from a two-year-old standing alone, does not give rise to probable cause should have been patently obvious to any reasonable law enforcement official."  Cortez v. McCauley, 478 F.3d at 1118.  As the Court has noted, the case before it is substantially different from Cortez v. McCauley.  Here, Casaus did seek a warrant before arresting Garcia, officers interviewed all the adults who interacted with K.J. that evening, officers took the wet bedding into evidence, officers photographed Garcia's wet pant legs, officers obtained statements from Katz and Odom, and officers conducted a safe-house interview with K.J.  Furthermore, K.J. was five-years old at the time of the incident and repeatedly stated that "the kid's dad" or "that guy," Safe-House Tr. at 3:2-3, 3:20-21, Lepori Report at 7, or "Mr. Mitchell" had hurt him, Phelps Report at 1. There was also some physical evidence corroborating K.J.'s accusation that Garcia urinated on him, because the bedding where K.J. was sleeping was wet and Garcia's pants were wet.  See Thacker Report at 1; Phelps Report at 1.  This case is also substantially different from the circumstances in Baptiste v. J.C. Penny Co., where the Tenth Circuit affirmed the denial of qualified immunity for officers who relied solely on the statements of store security guards -- despite having seen a contradictory security videotape capturing the events in question -- to establish probable cause for arrest.  See 147 F.3d at 1254.  The Tenth Circuit noted that, because the officers "had the benefit of observing the very conduct which they knew served as the basis for the guard's allegations," they were not entitled to rely solely on the security guard's allegations.  See 147 F.3d at 1257.  The Tenth Circuit also held that "police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and

-100-

make an independent probable cause determination based on that investigation." Baptiste v. J.C. Penny Co., 147 F.3d at 1259. Here, unlike Baptiste v. J.C. Penny Co., the police officers: (i) interviewed K.J., Katz, Odom, and Garcia; (ii) collected the wet bedding as evidence; (iii) took photographs as evidence; and (iv) conducted a safe-house interview of K.J. with a specialized interviewer. The record does not establish that the police officers ignored "easily accessible evidence." 147 F.3d at 1259. Although a controlling decision need not declare the "very action in question . . . unlawful," see Anderson v. Creighton, 483 U.S. at 640, "'the contours of the right [must be] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186. The facts of this case are sufficiently distinct from Baptiste v. J.C. Penny Co. and Cortez v. McCauley, because the police conducted a more thorough investigation than either case, that a reasonable official would not understand that what she was doing violated the Fourth Amendment.

This case more closely resembles Easton v. City of Boulder, where a three-year old and five-year old reported abuse, and the Tenth Circuit held that probable cause existed. See 776 F.2d at 1449. There, the Tenth Circuit noted:

> Here the inconsistencies pressed by Easton do nothing to undermine the solid core of the children's statements regarding the laundry room assault and the location of the perpetrator's apartment. Nor do they detract from the detectives' impression, based on personal observation of Michael's demeanor and behavior, that his statements were spontaneous and revealed knowledge of this that a child his age could not possibly possess had an event of the kind not occurred.

776 F.3d at 1450. This case also involves the statements of a five-year old child. Additionally, just as the statements of the three-year old corroborated the five-year olds statements in Easton v. City of Boulder, see 776 F.2d at 1443, here, Katz' and Odom's statements as well as the wet bedding and Garcia's wet pants corroborated K.J.'s statements. As in Easton v. City of Boulder, the police, in

the case before the Court, twice spoke to K.J., who consistently made allegations against Garcia. Moreover, police also interviewed Garcia, Katz, and Odom. The police also collected evidence and photographed the scene before arresting Garcia.

Because of the similarities between this case and Easton v. City of Boulder, as well as the factual distinctions between this case and Cortez v. McCauley, the Court finds that the law was not clearly established that a safe-house interview of a child victim who repeats accusations made to police officers at the scene and hearsay statements through the child's mother, and corroborating physical evidence that supports the child's accusation does not constitute probable cause. The similarities between this case and Easton v. City of Boulder are such that the contours of the right, if it was violated, was not sufficiently clear and "'a reasonable official would [not] understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001). Casaus also sought a warrant before arresting Garcia, and "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." Malley v. Briggs, 475 U.S. 335, 344-45 (1986). Even if Casaus made a mistake in believing that there was probable cause to support a warrant and arrest, the record before the Court does not establish that Casaus was "plainly incompetent" or that she "knowingly violate[d] the law," such that she would not be entitled to qualified immunity. Malley v. Briggs, 475 U.S. at 341.

Accordingly, the Court finds that, because Casaus had probable cause to arrest Garcia, was entitled to rely on the arrest warrant, and is entitled to qualified immunity, summary judgment in favor of Casaus on the false-arrest claim in Count I is proper.

III.    **CASAUS IS ENTITLED TO QUALIFIED IMMUNITY AND SUMMARY JUDGMENT ON GARCIA'S FOURTH-AMENDMENT MALICIOUS-PROSECUTION CLAIM.**

To establish a malicious-prosecution claim under § 1983, a plaintiff must prove that the defendant initiated or continued a proceeding against him without probable cause.  See Becker v. Kroll, 494 F.3d 904, 913-14 (10th Cir. 2007).  A malicious-prosecution claim requires that a plaintiff show: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."  Miller v. Arbogast, No. 11-2010, 2011 WL 5042516, at *2 (10th Cir. Oct. 25, 2011).  Because the Defendants have invoked the doctrine of qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d at 1107.

There is no dispute that Casaus caused Garcia's continued confinement through her arrest warrant affidavit, and that Garcia was in custody from February 12, 2010 to June 4, 2010.  See Response at 8; MSJ ¶¶ 34, 46, at 13, 17-18.  The Defendants argue that the original action did not terminate in favor of Garcia.  See MSJ at 36.  This argument is unpersuasive because the Nolle Prosequi stated that "there was insufficient evidence to continue the prosecution."  MSJ ¶ 49, at 18.  The Tenth Circuit has held that, where a nolle prosequi dismissal is entered because of a judgment by the prosecutor that the case could not be proven beyond a reasonable doubt, such action is a favorable termination.  See Wilkens v. DeReyes, 528 F.3d 790, 803 (10th Cir. 2008).  Here, the original action was terminated because the prosecution did not believe it had the evidence to prove

-103-

its case, and, in the Tenth Circuit, that action is a favorable termination.  See Wilkens v. DeReyes,

528 F.3d at 803.  Garcia challenges both the initiation of his arrest and the grand-jury indictment.

Courts undertake a five-step inquiry with regard to whether probable cause supported an

arrest: (i) the court determines if there is a question of fact whether particular items of evidence were

fabricated; (ii) the court eliminates those items from consideration in its probable-cause analysis;

(iii) the court determines whether exculpatory evidence was improperly excluded from

consideration; (iv) the court includes any such evidence in its analysis; and (v) the court determines

whether probable cause still exists after factoring in all excisions and additions.  See Grubbs v.

Bailes, 445 F.3d 1275, 1278 (10th Cir. 2006)(citing Taylor v. Meachum, 82 F.3d 1556, 1562(10th

Cir. 1996)).  Casaus had probable cause to arrest Garcia and Garcia did not argue that Casaus

"knowingly or with reckless disregard for the truth," included false statements in the affidavit.

Franks v. Delaware, 438 U.S. 154, 155-56 (1978).  This case is materially different from O'Connell

v. City of Santa Fe, where Judge Black commented that the issue of probable cause was a "close

call" and found that the defendants lacked probable cause.  See Memorandum Opinion and Order

at 23.  Here, K.J. made relatively consistent remarks and described in detail what had happened to

him.  This information was communicated in the arrest warrant affidavit.  The only exculpatory

evidence that Garcia asserts Casaus did not consider is his contention that Katz and Odom were

biased against him because he refused Odom's advances, and the lack of DNA evidence of the

bedding.  These considerations do not vitiate the existence of probable cause.  That the laboratory

was unable to test for urine and the leap from rejection leading to Katz and Odom framing Garcia,

are not enough to undermine probable cause.  In Miller v. Arbogast, the Tenth Circuit addressed

similar circumstances and stated:

> This arguments would run as follows: the defendants had motive to lie, therefore any of the statements in the affidavit could be lies, and therefore none of the statements can be considered under the extractive-additive framework. . . . On appeal, Miller points to no additional evidence in the record to substantiate his theory. The Court therefore declines to discount the statements in the warrant affidavit on this basis.

2011 WL 5042516, at *6. Furthermore, the Tenth Circuit has explained that, when information left out of an affidavit would not alter whether the affidavit sets forth probable cause, the plaintiff suffers no harm. See Easton v. City of Boulder, 776 F.2d at 1451. There, the Tenth Circuit explained:

> Easton also argues that because the affidavit submitted to Judge Torke by Allen and Sundberg makes no references to the inconsistences, and otherwise rephrases some of the children's statements, the detectives are guilty of intentionally misleading the judge. However, because the evidence excluded in no way alters the fact that the evidence included states probable cause, the warrant was valid, whatever the intent of the officers, and Easton suffered no harm.

776 F.3d at 1451. Thus, as the Court determined with respect to the false-arrest claim, there was probable cause to arrest Garcia.

The Court next turns to Garcia's claims that Casaus failed to disclose material information to the grand jury, including the "non-existence of physical evidence," and the lack of support for the count alleging anal intercourse with the child, and that Casaus materially misrepresented facts. See Response at 34, 36-39. The Tenth Circuit has held that

> A prosecutor's decision to charge, a grand jury's decision to indict . . . none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision . . . . If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors, or magistrates who confine or prosecute him. They cannot hide behind the officials whom they have defrauded.

Pierce v. Gilchrist, 359 F.3d 1279, 1292 (10th Cir. 2004). In this case, the grand jury indicted Garcia on: (i) two counts of Criminal Sexual Penetration in the First Degree contrary to N.M.S.A. 1978, § 30-9-11D(1); (ii) one count of Child Abuse -- Intentional (No Death or Great Bodily Harm)

contrary to N.M.S.A. 1978, § 30-6-1D; and (iii) one count of Contributing to the Delinquency of a

Minor contrary to N.M.S.A. 1978, § 30-6-13.  See Casaus Decl. ¶ 29, at 7-8; MSJ ¶ 41, at 16-17. As

a matter of New Mexico law, the indictment constituted a finding by the grand jury of probable

cause, see N.M.S.A. 1978, § 31-6-10, which finding, as a matter of state law, generally is not subject

to judicial review, see N.M.S.A. 1978, § 31-6-11A; New Mexico v. Elam, 86 N.M. 595, 598, 526

P.2d 189, 192 (Ct.App.1974).

       First, Garcia contends that Casaus failed to disclose the lack of physical evidence or "correct

a basic failure in the indictment."  Response at 34.  As the Court has previously held in Zamora v.

City of Belen, 383 F.Supp.2d 1315 (D.N.M. 2005)(Browning, J.), this argument "fundamentally

misconstrues the roles and respective duties of, on the one hand, an investigating law enforcement

officer who testifies before a grand jury, and, on the other hand, the prosecuting attorney."  383

F.Supp.2d at 1334.  Casaus turned over the original copies of all documentary evidence that she had

in connection with the case as well as the video recordings of K.J.'s safe-house interview and

Garcia's interrogation.  See Casaus Decl. ¶ 29, at 7.  Garcia has introduced no evidence that Casaus

withheld evidence from the prosecutor.  See MSJ at 34.  In Zamora v. City of Belen, the Court held

that the defendant police officer was entitled to absolute immunity for decisions about what evidence

to present to the grand jury:

> To hold otherwise would lead to the untenable situation in which an officer faithfully
> and dutifully discloses all material evidence -- exculpatory and otherwise -- to the
> prosecutor, but can nevertheless be held liable for damages arising out of the
> prosecutors' legal decision to not present certain evidence at the grand jury
> proceedings.  That is a result no court has yet endorsed.

383 F.Supp.2d at 1335. It was Casaus' function as a complaining witness to answer all questions

honestly, see Pierce v. Gilchrist, 359 F.3d at 1292, not to determine whether there was evidence to

support a charge in the indictment.  Determining the charges to include in the charging instrument is the prosecutor's function and deciding whether there is evidence to support an indictment is the grand jury's function.  Moreover, the jurors would have been aware of the "complete lack of lack of physical evidence," because no physical evidence, other than presumably an explanation that Garcia's pants were wet and that the bed was wet, would have been presented to them.  Response at 34.  The jurors could also have asked questions about the lack of physical evidence, because it is evident that they questioned other aspects of the investigation.  See GJ Tr. at 48:10-15 ("Ms. Lima: Any further questions?  Female Juror: Does it normally take -- I see there's like 16 days from the incident to when they actually did the Safehouse interview.  Does it normally take that long to set something like that up?").

Second, Garcia contends that Casaus falsely stated to the grand jury that K.J. had directly named the perpetrator as "Mr. Mitchell" and falsely attributed Garcia's statement "kids" to patrol officers rather than Katz.  Response at 37.  Neither of these statements rises to the level of reckless or deliberate falsehood.  In O'Connell v. City of Santa Fe, Judge Black dealt with a similar issue where "Boy never said the name 'Mark' during his interview," but during the officer's grand-jury testimony, the officer "repeated the contents of his report, with the embellishment that Boy 'kept repeating' that 'Mark' poked him in the butt."  Memorandum Opinion and Order at 17-18.  Judge Black held that "while this inaccurate statement may have been negligent and was certainly regrettable, it does not rise to the level of reckless or deliberate falsehood."  O'Connell v. City of Santa Fe, Memorandum Opinion and Order at 18.  Similarly, here, there was an allegation from Odom and from Phelps that K.J. identified "Mitch" or "Mr. Mitchell," Phelps Report at 1; Odom Statement at 1; however, at no time during the safe-house interview did K.J. identify the perpetrator

by name, see Safe-House Tr. at 2:20, 3:20 (referring to the perpetrator as "the guy" and "the kids' dad").  The Court agrees with Judge Black that this mistake does not rise to the level of recklessness or deliberate falsehood; instead, it is evidence of no more than negligence or mis-remembering witness statements.  Likewise the mis-attribution of the "kids" statement to responding officers at the scene rather than to Katz is an understandable mistake and does not reflect the intentional deceit Pierce v. Gilchrist envisions.

Because Casaus has established that she is entitled to judgment as a matter of law on the malicious-prosecution claim in Count II, the Court will enter summary judgment in her favor. Furthermore, because Garcia has not established that there was a constitutional violation, Casaus is entitled to qualified immunity on the malicious-prosecution claim in Count II.

## IV.   THE CITY OF RIO RANCHO IS ENTITLED TO SUMMARY JUDGMENT ON THE FEDERAL MUNICIPAL LIABILITY CLAIMS.

The Defendants argue that there is no basis for Garcia's assertion that Casaus violated any of Garcia's rights and that alone is a basis for granting the Motion for Summary Judgment on the municipal liability claims.  See MSJ at 38.  The Defendants further argue that Garcia has failed to develop any evidence that a policy or custom of the City of Rio Rancho was the moving force behind any constitutional violation alleged against Casaus.  See MSJ at 38.  Garcia argues that a reasonable fact-finder could determine that the City of Rio Rancho is liable for: (i) failure to train and supervise; (ii) negligent hiring, supervision, or retention; or (iii) having a police, custom, or practice of violating the constitutional rights of citizens.  See Response at 21.  Garcia also argues that he has entered into the record sufficient evidence to reach trial on the issue of municipal liability, because he has provided evidence demonstrating that the City of Rio Rancho was negligent and/or reckless in contracting with entities who conduct "scientifically out-dated safe-house

interviews." Response at 21-22. Garcia asserts that the City of Rio Rancho is responsible for the constitutional violations that resulted from these interviews, and that it has a policy or custom of imposing no quality control standards. See Response at 23. With respect to Garcia's claims that the City of Rio Rancho failed to train or supervise Casaus, Garcia contends that nowhere does Sandoval County require specialized training in protecting the accused's due process rights and that Casaus has zero hours of constitutional rights training. See Response at 25. The Defendants deny that the safe-house interview was improper, and argue that Garcia has not shown that the Defendants were aware or had any reason to believe that the methods were improper. See Reply at 11. The Defendants argue that Garcia presents no evidence which establishes that any of the interviewer's techniques were a constitutional violation. See Reply at 11. The Defendants also assert that, to succeed on a failure-to-train claim, Garcia must establish that the failure to train amounted to deliberate indifference and that such claims require an expert to prove them. See Reply at 14.

"[I]n order to hold a municipality liable for an employee's constitutional violations, a plaintiff must show not only that a constitutional violation occurred, but also that some municipal policy or custom was the moving force behind the violation." Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1320 (10th Cir. 1998). The Court has found, as a matter of law, that Casaus did not commit a constitutional violation when she arrested Garcia. Garcia concedes that the Court cannot find the City of Rio Rancho liable under federal law in the absence of an employee's constitutional violation. See Response at 24. Even if the Court were to find a constitutional violation, because of a lack of probable cause to arrest, Garcia has not put forward sufficient evidence raising a genuine issue of material fact that the City of Rio Rancho's failure to adopt a policy or set safe-house interview standards was the moving force behind that violation.

Liability can extend to a municipality for failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect" a class of persons. Barney v. Pulsipher, 143 F.3d at 1309 & n.8. "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable. Barney v. Pulsipher, 143 F.3d at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08. See Williams ex rel. Hart v. Paint Valley Local Sch. Dist., 400 F.3d at 369 ("The evidence must show that the need to act is so obvious that the School Board's 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to Doe's constitutional rights." (emphasis omitted)). Most cases, however, will not fall within this "narrow range of circumstances" without "a pattern of violations." Barney v. Pulsipher, 143 F.3d at 1308.

With respect to the allegations that the City of Rio Rancho failed to set standards for safe-house interviews, Garcia has not demonstrated that a pattern of violations occurred, which courts normally require to establish that the failure to adopt a policy was the moving force behind a constitutional violation. See Barney v. Pulsipher, 143 F.3d at 1308. Garcia points to no other cases where police officers have relied on inadequate safe-house interviews for probable cause and falsely arrested an individual. Even drawing all reasonable inferences in favor of Garcia -- that there was a constitutional violation and that an unreliable safe-house interview contributed to this violation --

this one incident does not lead the Court to the conclusion that the City of Rio Rancho needed to adopt a set of safe-house interview standards to avoid future constitutional violations. To the extent that Garcia relies on Herrera v. Cnty. of Santa Fe, 213 F.Supp.2d 1288 (D.N.M. 2002)(Black, J.), to establish that the City of Rio Rancho may be held liable for any safe-house interview deficiency contributing to a constitutional violation because it has contracted with All Faiths Receiving Home, Garcia has presented no evidence that the City of Rio Rancho is the municipal body responsible for delegating a "public function." 213 F.Supp.2d at 1292. The only regulations to which Garcia points are the Sandoval County Child Abuse Protocols, which provides that "where the victim is under 14 years old a Safehouse interview will be scheduled," and that "Law Enforcement or protective Services may schedule a Safehouse Interview by calling All Faiths Receiving Home." Sandoval County Child Abuse Protocols at 4, 6, filed October 7, 2011 (Doc. 41-12). Because it is Sandoval County's regulations that may delegate -- if there is a delegation -- the public function of interviewing to All Faiths Receiving Home, it is not clear to the Court, and Garcia points to no evidence in the record, that the City of Rio Rancho has control over that delegation or that it has the authority to establish regulations about how All Faiths Receiving Home conducts interviews. It appears to the Court that, if Garcia intends to rely on the interview as the basis of municipal liability, then he has sued the wrong entity. Indeed, in his Response concedes that he may have named the wrong party with respect to this claim. See Response at 25 ("To the extent that the Board of County Commissioners of Sandoval County should be named as a party, as opposed to the City of Rio Rancho, leave for free and liberal amendment is typically granted.").[40] Furthermore, in Herrera v.

---

[40]In his Response, Garcia did not specifically request leave to amend to add Sandoval County as a Defendant in this case. Additionally, this case has proceeded past the stage where amendment could be easily accomplished because discovery has closed and the parties were scheduled to go to

Cnty. of Santa Fe, the plaintiff alleged that the sub-contractor detention facility employees were directly responsible for the brutality he suffered.  See 213 F.Supp.2d at 1292.  Here, Garcia does not argue that the interview itself was a constitutional violation, but that it created unreliable evidence, which was then used to cause his arrest.  See Response at 23 ("For this reason, a reasonable fact-finder could conclude the City of Rio Rancho is responsible for violation of the Constitutional rights of citizens in utilizing these interviews, and of having a policy and custom of having no quality control standards, as demonstrated in this case.").  Thus, there is no contention that All Faith's Receiving Home has violated Garcia's constitutional rights.  Additionally, the United States Court of Appeals for the Ninth Circuit has held that "there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way."  Devereaux v. Abbey, 263 F.3d 1070, 1075 (9th Cir. 2001)(en banc).  Even if the Court had concluded that Casaus lacked probable cause, the Court concludes that Garcia could not establish municipal liability based on a failure to set standards for safe-house interviews, because Garcia points to no pattern of constitutional violations or evidence that the City of Rio Rancho was the moving force behind the constitutional violation.  The City of Rio Rancho did not do anything or omit to do anything here; one official made a discretionary call that probable cause existed.  Garcia further fails to identify any evidence that the City of Rio Rancho's "failure to act [was] substantially certain to result in a constitutional violation," or that "it consciously or deliberately" chose "to disregard the risk of harm."  Barney v. Pulsipher, 143 F.3d at 1307.

---

trial in less than a week, should the Court's Memorandum Opinion and Order not dispose of the case.

Turning to Garcia's contention that the City of Rio Rancho failed to train Casaus regarding the accused's constitutional due process rights, the Court concludes that, even if there was a constitutional violation, Garcia has provided no evidence suggesting that a failure to train was the result of deliberate indifference.  See Gose v. Bd. of Cnty. Comm'rs of Cnty. of McKinley, 778 F.Supp.2d 1191, (D.N.M. 2011)(Browning, J.)("Moreover, Gose's contention that McKinley County failed to adequately supervise or train its correctional officers fails as a matter of law, because there is no evidence that McKinley County's failure to properly train or to supervise its correctional policies was the result of McKinley County's deliberate indifference.").  "It is not enough, however for appellant to show that there were general deficiencies in the county's training program." Lopez v. LeMaster, 172 F.3d 756, 760 (10th Cir. 1999).  "A supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." Meade v. Grubbs, 841 F.2d at 1527.  Garcia presented evidence that Casaus has zero hours of specialized training on the accused's due process rights and some evidence that Casaus did not understand the standard she must satisfy before making an arrest.  See Response at 15, 25; Training Certificates of Detective Casaus, filed October 21, 2011 (Doc. 46-10); Casaus Depo. at 60:12-62:4.   Garcia again failed to introduce any evidence demonstrating that there was a pattern of constitutional violations.  A pattern of violations sufficient to demonstrate deliberate indifference, particularly in the context of allegations that officials failed to train, requires "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." Connick v. Thompson, 131 S.Ct. at 1360 (2011).  Generally, the incidents must also be sufficiently similar to put officials on notice of the situation.  As the Supreme Court illustrated in Connick v. Thompson:

-113-

> Although Thompson does not contend that he proved a pattern of similar <u>Brady</u> violations, he points out that, during the ten years preceding his armed robbery trial, Louisiana courts had overturned four convictions because of <u>Brady</u> violations by prosecutors in Connick's office.  Those four reversals could not have put Connick on notice that the office's <u>Brady</u> training was inadequate with respect to the sort of <u>Brady</u> violation at issue here.  None of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind.  Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation.

131 S.Ct. at 1360 (footnote omitted)(citations omitted).  Garcia also did not argue or present evidence establishing that the likelihood of a constitutional violation was "patently obvious." <u>Connick v. Thompson</u>, 131 S.Ct. 1350, 1361 (2011).  The Court, however, views the failure to train police officers regarding the accused's due process rights, beyond the training received as a recruit, as similar to the failure to train prosecutors regarding <u>Brady</u> violations.[41]  The Supreme Court, in <u>Connick v. Thompson</u>, held that "failure to train prosecutors regarding their <u>Brady</u> obligations does not fall within the narrow range of . . . single incident liability." 131 S.Ct. at 1361.  Because Garcia did not introduce any evidence which shows that there was a pattern of constitutional violations resulting from a failure to train officers in due process protections or that the likelihood of a constitutional violation was patently obvious, the Court concludes that, even if Casaus had lacked probable cause to arrest Garcia, there is no municipal liability.

Ultimately, because Garcia failed to prove an underlying constitutional violation by Casaus, the City of Rio Rancho is entitled to summary judgment on Garcia's municipal liability.  <u>See</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)(per curiam); <u>Monell v. Dep't of Soc. Servs.</u>, 436

---

[41]The Supreme Court in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.

U.S. 658, 691 (1978)("Congress did not intend municipalities to be held liable unless action

pursuant to official municipal policy of some nature caused a constitutional tort.").[42]

## V. THE COURT WILL DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS IN THE CASE.

On June 20, 2011, the parties stipulated to the dismissal of Count III of the Complaint,

Garcia's Fourth-Amendment claim for a search of his home, and the Court ordered Count III

dismissed with prejudice. See Unopposed Motion to Dismiss Count III (Unlawful Search of Home)

Against Defendants with Prejudice at 1; Order of Dismissal of Count III.  The Court has determined

that summary judgment in favor of the Defendants is appropriate on all remaining federal claims,

Counts I and II of the Complaint.  Upon the entry of this Memorandum Opinion and Order, there

will be no federal claims before the Court.

28 U.S.C. § 1367(c)(3) provides: "The district courts may decline to exercise supplemental

jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has

original jurisdiction."  28 U.S.C. § 1367(c).  The Tenth Circuit reviews a district court's decision

not to exercise jurisdiction under 28 U.S.C. § 1367(c) for abuse of discretion.  See Nielander v. Bd.

of Cnty. Comm'rs, 582 F.3d 1155, 1172 (10th Cir. 2009).  The Tenth Circuit has held: "When all

federal claims have been dismissed, the court may, and usually should, decline to exercise

jurisdiction over any remaining state claims."  Koch v. City of Del City, No. 10-6105, 2011 WL

5176164, at *14 (10th Cir. Nov. 2, 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n,

---

[42]Municipal liability and supervisory liability are distinct theories under 42 U.S.C. § 1983. See Lewis v. McKinley Cnty. Bd. of Cnty. Comm'rs, 425 F.App'x 723, 727-729 (10th Cir. 2011). Here, Garcia did not address supervisory liability under federal law.  See Response at 21-27.  The Court therefore need not address the question that the Tenth Circuit left open in Dodd v. Richardson, whether supervisory liability remains a viable theory under 42 U.S.C. § 1983 after the Supreme Court's decision in Ashcroft v. Iqbal.  See 614 F.3d at 1200.

149 F.3d 1151, 1156 (10th Cir. 1998)).  The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  This Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, No. 08-0336, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  Additionally, the Tenth Circuit has recognized that a district court does not commit an "abuse of discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'"  Muller v. Culbertson, 408 F.App'x 194, 197 (10th Cir. 2011)(unpublished).

    This is a removed case.  See Notice of Removal at 1.  After the Court's determinations in this Memorandum Opinion and Order that summary judgment in favor of the Defendants on all federal claims is appropriate, the Court concludes that remand of the state law claims is proper.  The Notice of Removal indicates that the only basis for subject-matter jurisdiction in the federal courts is 28 U.S.C. § 1331, federal question jurisdiction.  Given the Tenth Circuit's guidance that, "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims," the Court concludes that remanding the remaining state law claims is the appropriate resolution of this matter.  Koch v. City of Del City, 2011 WL 5176164, at *14 (quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d at 1156).

Because the Court determines that there are no federal claims remaining, the Court will decline to exercise supplemental jurisdiction and will remand the state claims to the Thirteenth Judicial District Court, Sandoval County, State of New Mexico.

**IT IS ORDERED** that Defendants Monica Casuas and the City of Rio Rancho's Motion for Summary Judgment, filed October 7, 2011 (Doc. 41)("MSJ") is granted in part and denied in part. The Court grants the Motion for Summary Judgment with respect to Counts I and II of the Complaint as to both Defendants. The Court will not decide the Motion for Summary Judgment with respect to Garcia's state law claims, Counts IV and V, because the Court declines to exercise supplemental jurisdiction over those claims. The Court remands Counts IV and V of the Complaint and the case to the Thirteenth Judicial District Court, Sandoval County, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Derek V. Garcia
Law Office of Derek V. Garcia
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Ronald Gould
Robert W. Becker
French & Associates, P.C.
Albuquerque, New Mexico

    *Attorneys for the Defendants*